In re ART SHIRT LTD., INC. (Jointly administered with: the Cracker Barrel Dresses, Ltd., Bankruptcy No. 80–03429K Richard Todd, Inc. Bankruptcy No. 80–03430K) Debtor.

Louis W. FRYMAN, Esquire, Trustee of Art Shirt Ltd., Inc., Plaintiff,

v.

CENTURY FACTORS, FACTOR FOR NEW WAVE, Defendant.

Louis W. FRYMAN, Esquire, Trustee for Art Shirt Ltd., Inc., Plaintiff,

v.

CENTURY FACTORS, FACTOR FOR CARNA MILLS.

Bankruptcy No. 80–03428S
Civ. A. Nos. 87–1175, 87–1176.
Adv. Nos. 82–2341(8)S, 82–0240(12)S.

United States District Court,
E.D. Pennsylvania.

March 10, 1988.

As Amended March 23, 1988.

Jacob Rabinowitz, New York City, for appellant.

Jay G. Ochroch, Philadelphia, Pa., for appellee/debtors.

Marvin Krasny, Philadelphia, Pa., for appellee/trustee.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

This is an appeal from a bankruptcy court decision allowing Louis Fryman, Trustee for Debtor Corporation, to avoid two transfers by Debtor to Century Factors, a factor for two of Debtor's suppliers. Century Factors contends: that the bankruptcy court erroneously considered pension liability as a debt in determining Debtor's solvency; that there was no evidence supporting a finding of insolvency; that the Trustee's expert did not correctly value Debtor's assets; and that the Trustee failed to prove all of the elements of a § 547 preference action. The Trustee has filed a cross appeal seeking reversal of the bankruptcy court's refusal to award interest on the recovered preferential transfers. Based on the following discussion, I will affirm the bankruptcy court's decision in its entirety.

## FACTS

This preference action was commenced on September 28, 1982, by the Trustee for Debtor's estate to set aside two transfers by Debtor. A hearing was set for March 30, 1983. Prior to the hearing, the Trustee filed a motion to employ an expert. Taking the Trustee's motion under advisement, Judge King proceeded to hear evidence on whether the Debtor was insolvent at the time of the transfers.

After a three year hiatus, the bankruptcy court resumed testimony on August 21, 1986[1]. At the second hearing, Judge King was no longer sitting and the testimony was heard by Judge Emil F. Goldhaber. At the hearing, the Trustee presented its two experts, Harris Devor, a certified public accountant (CPA), and Henry N. Portner, an attorney with expertise in pension law. Century Factors called another expert, Lawrence D. Bass, an attorney and CPA.

During the cross examination of Mr. Bass, the court suggested continuing the case to a later date. At a subsequent conference, presided over by Judge Scholl, the court ordered the Trustee to file a motion for Summary Judgment[2] by November 7, 1986, and for Century Factors to respond by November 7, 1986. Neither party objected nor sought relief from the court's order. In an opinion dated December 23, 1986, 68 B.R. 316, the bankruptcy court made findings of fact and conclusions of law based on the record made at the hearings and ruled that the Debtor was insolvent on the date of the transfers. The court based its decision, in large part, on the testimony of the Trustee's experts, Mr. Devor and Mr. Portner. The Debtor's insolvency was caused mainly by the inclusion of its pension liability as a debt under the Bankruptcy Code ("the Code"). After concluding that the delays in prosecution of the case were due mainly to the failure of the Trustee to obtain an expert prior to the initial hearings, the court refused to award

1. At the hearing on March 30, 1983, the parties submitted a stipulation regarding the dates of transfer. After the hearing, on July 20, 1983, the parties executed a stipulation narrowing the issues in the case. The Trustee moved for a directed verdict. On July 27, 1983, Century Factors filed a motion to be relieved from the stipulation, claiming that the Trustee had agreed to, but failed to make, certain changes in the stipulation before submitting it to the court. Argument was heard on these motions, on September 13, 1983, by Judge William A. King, Jr. On January 14, 1986, the bankruptcy court denied the Trustee's motion for directed verdict and granted Century Factors' motion for relief from the stipulation.

On January 27, 1986, the court directed the parties to continue settlement negotiations and ordered trial briefs to be submitted by February 19, 1986. A second motion for directed verdict, filed by the Trustee on February 20, 1986, was denied on March 31, 1986. On April 10, 1986, the court granted the Trustee's previous motion for a continuance and ordered a second hearing which, after several continuances, was held on August 21, 1986.

2. Although the court asked for motions for "Summary Judgement", the Trustee filed a Motion for "Judgement". The court later stated that it considered the Trustee's Motion for Judgement" appropriate.

interest on the recovered preference. This appeal followed.

## DISCUSSION

### A. "Ripeness" for Decision

█ As a threshold matter, I must decide whether this case is "ripe" for judgment. Trustee asserts that on August 21, 1988, during the cross examination of Mr. Bass, the court suggested continuing the hearing to another date. Although the Trustee had completed questioning Mr. Bass about pension liability, cross examination remained as to other matters. In order to avoid bringing Mr. Bass back from New York for another day of questioning, the parties agreed, according to the Trustee, to have the court resolve whether the Debtor was insolvent at the time of the transfers and whether the Debtor had a defense under § 547(c)(3). If these two issues were decided in favor of the Trustee, it would prevail and there would be no need for further testimony. Century Factors however, asserts that the parties could not agree on what issues were appropriate for judgment and that he notified Judge Scholl that the hearing had not been completed and that judgment was premature.

In making their arguments both the Trustee and Century Factors rely on discussions held off the record. In making my decision, I must rely solely on the record before me. Gratuitous statement by either side, unsupported by the record, cannot be considered. While I agree that it would be unfair to make a decision before either side had completed its case, I find that based on the record before me the parties agreed that the resolution of certain issues was appropriate.

The record reveals that on September 5, 1986, Judge Scholl ordered both parties to submit findings of fact and conclusions of law. In addition, on October 29, 1986, after "a conference with counsel for [both parties]" Judge Scholl ordered both sides to submit a motion for "Summary Judgement, relating to all outstanding issues" and, as noted above, neither party objected nor sought relief from the October 29, 1986 order.

In its motion filed pursuant to the October 29, 1986 order, Century Factors did not argue that the case was not ripe for judgment. In fact, Century Factors stated that the "parties and the Court have agreed that certain issues are ripe for determination and accordingly the Court entered an order on October 29, 1986." The first time Century Factors argued that an agreement was not reached was in its motion for reconsideration of Judge Scholl's December 23, 1986 decision which was denied on February 4, 1987. Therefore, based on the record before me, I find that the parties agreed to have the court decide certain issues in order to avoid the need for further testimony. Accordingly, the case is "ripe" for judgement.

### B. Insolvency

#### 1. *Debtor's Pension Liability*

█ Century Factors argues that the bankruptcy court erred by concluding that the Debtor's pension liability was a debt for the purposes of determining Debtor's insolvency. Testimony at the hearings revealed that the Debtor's withdrawal liability[3] was $1,007,000 when the Chapter 11 petition was filed on December 24, 1982. The Trustee's expert also testified that that figure "would approximate the amount of [the Debtor's withdrawal liability] two or three months before" the date of the filing, Trial Transcript ("T.R.") August 21, 1986, at 19, and that as a result of the pension liability, the Debtor was insolvent on date of the transfers.

Century Factors agreed that if the amount of withdrawal liability were included in the Debtor's liabilities the Debtor

---

**3.** Withdrawal liability is an employer's long term debt to a multiemployer pension plan for any unfunded vested benefits attributed to its employees once the employer either completely or partially withdraws from a pension plan. 29 U.S.C. § 1381. If any employer fails to pay its withdrawal liability, the Pension Benefit Guarantee Corporation (PBGC), a corporation created under ERISA, 29 U.S.C. § 1302, will satisfy that employer's obligation to the fund and lodge a claim against the delinquent employer. 29 U.S.C. § 1368.

would have been insolvent on the date of the transfers. Century Factors expert, however, testified that such liability should not be included as a debt. The bankruptcy court, refusing to decide the issue based on an independent analysis of the Code, ERISA, and MEPPAA, ruled that based on the evidence adduced at trial the Debtor's pension liability should have been included on its balance sheet and, as a result, the Debtor was insolvent on the transfer dates. Although I will affirm the bankruptcy court's decision, I do so by doing, in part, what the bankruptcy court did not do—by making an independent analysis of the Code, ERISA, and MEPPAA.

The substance of Century Factors' argument is that withdrawal liability does not arise under the ERISA until the employer withdraws from the plan. Any time before actual withdrawal, Century Factors argues, the employer's liability is "at best, an unfixed, contingent liability [which is] neither due nor owing, [and is] not a liability which should be used in determining the insolvency of the debtor."

After reviewing the relevant statutes and case law, I find that Century Factors' argument is unconvincing. Under the Code, "Insolvent" is defined as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property at fair valuation." 11 U.S.C. § 101(29)(A) (1982 Supp. II). "Debt" is defined as liability on a claim. *Id.* at § 101(11). A "Claim" is defined as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured;

*Id.* § 101(4). The existence of a right to payment is determined by the law governing the relationship between the parties.

*See In re Altair Airlines,* 727 F.2d 88, 90 (3d Cir.1984). In this case the law governing the relationship of the parties is ERISA and MEPPAA.

The legislative history, policies and goals of ERISA and MEPPAA have been sufficiently outlined in previous cases and need not be repeated here. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984); *Board of Trustees v. Thompson Bldg. Materials, Inc.,* 749 F.2d 1396 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985); *Peick v. PBGC,* 724 F.2d 1247 (7th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984); *Robbins v. Pepsi Cola Metro. Bottling,* 636 F.Supp. 641 (N.D.Ill. 1986). It is sufficient to say that ERISA is a comprehensive statutory scheme designed to insure that employees and their beneficiaries do not lose expected pension benefits because their pension plan was terminated. *Gray,* 467 U.S. at 720, 104 S.Ct. at 2713. To accomplish this, Congress enacted ERISA which, *inter alia,* established minimum funding standards. In addition, the MEPPAA amended ERISA to define an employer's liability to contribute to a pension plan upon its withdrawal from the fund.

Although Century Factors is correct in asserting that withdrawal liability does not arise until an employer withdraws from a plan, this does not prove that the Debtor did not owe a debt to the pension fund on the transfer dates which approximated the amount of its subsequent withdrawal liability. ERISA requires that employee pension plans should provide vested benefits to employees after a designated terms of service. *Amalgamated Ins. Fund v. William B. Kessler, Inc.,* 55 B.R. 735, 737 (S.D.N.Y. 1985). Under ERISA, each plan must meet minimum funding standards, 29 U.S.C. § 1001(c), by maintaining a minimum funding account to which certain statutorily defined credits and debits are charged. *See id.* § 1082(b). If the charges to the funding account exceed the credits, an accumulated funding deficiency exists. 29 U.S.C. § 1082; *see Columbia Packing Co. v. Pension Benefit Guaranty Corp.,* 81 B.R. 205,

206 (D.Mass.1988); *Amalgamated Ins. Fund,* 55 B.R. at 737. Accumulations of funding deficiencies must be brought up to date and the failure to do so can result in employer liability. *See Amalgamated Ins. Fund,* 55 B.R. at 737, Novikoff & Polebaum, *Pension–Related Claims in Bankruptcy Code Cases,* 40 *Bus.Law.* 373, 376 (1985). The law, however, allows an employer to have his unfunded liability amortized and paid over a period of years.[4]

Upon withdrawal from a pension plan, an employer does not escape his liability to the plan. Instead, the employer is required to "pay a fixed and certain debt to the pension plan." *Gray,* 467 U.S. at 725, 104 S.Ct. at 2715. Determined by one of four statutory methods, 29 U.S.C. § 1391, this liability represents the employer's proportionate share of the "unfunded vested benefits calculated as the difference between the present value of the vested benefits and the current value of the plans assets." *Id.* (citing 29 U.S.C. § 1381, 1391). This liability represents an employer's "long term debt to a plan," *Massachusetts State Carpenters Pension Fund v. Atlantic Diving Co.,* 635 F.Supp. 9, 14 n. 3 (D.Mass.1984), which is accelerated "to finance employees' pension rights which have vested but which have not been fully funded." *Trustees of Amalgamated Ins. Fund v. McFarlin's,* 789 F.2d 98, 103 (2d Cir.1986).

Based on the above analysis, I find that withdrawal liability under the MEPPAA is a debt which should be considered in determining insolvency under the Code. It is clear from the case law analyzing withdrawal liability in a bankruptcy context that the relevant definitions of "debt" and "claim" are satisfied. *See* 11 U.S.C. §§ 101(11), (4)(A); *In Re Pulaski Highway Express, Inc.,* 57 B.R. 502 (Bankr.M.D. Tenn.1986). *Cf. In Re Fulghum Const. Co.,* 7 B.R. 629, 632 (Bankr.M.D.Tenn.1980) (definitions of debt and claim are coextensive) *aff'd,* 14 B.R. 293 (M.D.Tenn.1981), *aff'd in part, vacated in part on other grounds,* 706 F.2d 171 (6th Cir.), *cert. denied sub nom, Ranier & Assoc. v. Waldschmidt,* 464 U.S. 935, 104 S.Ct. 342, 78 L.Ed.2d 310 (1983); 2 Collier on Bankruptcy § 101.11 (10th ed. 1987).

The case of *In re Pulaski Highway Express, Inc.,* 57 B.R. 502 (Bankr.M.D. Tenn, 1986), is instructive. In *Pulaski,* an administrator of a multiemployer pension fund sought to have the fund's claim for withdrawal liability treated as an administrative expense. The issue in the case was not whether a claim existed, but when the claim arose. *Id.* at 507–08. The court stated that the withdrawal liability claim was an obligation to insure the payment of pension benefits which had accrued but were not payable until a future date. *Id.* at 507. According to the court, the "liability, *i.e. the 'right to payment',* is incurred when the employee benefits become nonforfeitable" and uncertainties as to the date of withdrawal do not defeat the existence of the pre-petition claim. *Id.* (footnote omitted) (emphasis added). The employer's termination merely allowed calculation of the liquid amount owed by the employer. *Id.*

I am aware of the holding in *In Re Computerized,* 40 B.R. 344 (Bankr.S.D.N.Y.1984). In *Computerized* an employer emerged from a Chapter 11 reorganization and ceased operations seven months later. The pension fund asserted a claim against the debtor for withdrawal liability. The debtor moved the court to hold the fund in contempt, arguing that the fund's claim was discharged as a result of the reorganization.

In ruling that the claim was not discharged, the court stated that since the debtor neither withdrew from the fund nor rejected the contract, under which the pension liability arose, during the Chapter 11 proceeding, the fund did not have a provable claim during the reorganization. *Id.* at 349. The court concluded that withdrawal liability was "triggered" when Debtor ter-

---

**4.** It is possible for plan participants to extend the time periods by changing actuarial assumptions, extending actuarial periods, or seeking a waiver of the minimum funding standard. *See Novikoff & Polebaum, supra,* at 379–90. Interestingly, these methods of seeking relief from the minimum funding standard, especially the waiver method, have been analogized to a loan which must be paid in subsequent years. *Id.* at 379.

minated its participation in the Fund, and merely because "the calculation of withdrawal liability includes pre-petition and pre-confirmation factors does not mean that such liability should be regarded as having accrued either during a pre-petition or a pre-confirmation period." *Id.* (citing *In Re Kessler*, 23 B.R. 722, 725 (Bankr. S.D.N.Y. 1982)).

Although neither *Pulaski* nor *Computerized* addressed the issue of whether withdrawal liability should be considered to be a debt for § 547 purposes, I find that the *Pulaski* is more persuasive in the context of this case. The *Computerized* court did not have the advantage, and thus did not discuss, the more recent judicial interpretation of withdrawal liability. *Pulaski*, 57 B.R. at 507. *See Trustees of Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 101–02; *In Re Malone*, 74 B.R. 315, 322 (Bankr.E.D.Pa.1987); *In re Gee & Missler Serv., Inc.*, 62 B.R. 841, 845 (Bankr.E.D.Mich.1986); *Amalgamated Ins. Fund v. William Kessler, Inc.*, 55 B.R. 735, 738 (S.D.N.Y.1985). *Cf. In re United Dept. Stores*, 49 B.R. 462, 467 n. 5 (Bankr. S.D.N.Y.1985) (recognizing inconsistency but distinguishing case). In addition, as the *Pulaski* court noted, the *Computerized* court relied on *In re Kessler*, 23 B.R. 722 (Bankr.S.D.N.Y.1982), a case which better supports a decision opposite that reached in *Computerized*.[5] Finally, my decision will further the policy of both the Code, in particular § 547(b), of providing an equitable distribution of the debtor's estate by marshaling as many assets as possible, for distribution to unsecured creditors, *see Kessler*, 23 B.R. at 725 and the MEPPAA's policy of securing the financial stability of pension funds by imposing withdrawal liability, which is usually an unsecured claim

in a Chapter 11 proceeding. *Pulaski*, 57 B.R. at 504.

Although there may be some discussion among accounting professionals relating to how pension liability should be reflected on an entity's financial statements and balance sheets, *see* Lorensen & Rosenfield, *Vested Benefits—A Company's Only Pension Liability*, Journ.Acct. October 1983, at 65, my decision is consistent with the testimony presented in the bankruptcy court. In addition, my opinion reflects the growing concern evident in the business world with the implications of pension liability. *See, e.g., F. Williams, Unfunded Vested Liability Casts Pall Over Pan Am Buy-out*, Pens. & Inv. Age, at 2 (March 9, 1987) (unfunded vested liability cited as major factor in preventing Pan–Am buyout); *Danger of Asset—Liability Studies*, Pens. & Inv. Age, at 10 (July 13, 1987) (discussing new concern over pension investment due to changing accounting practices).

It is true, of course, that the ongoing unfunded vested liability of an employer, *i.e.*, withdrawal liability, may fluctuate depending on various factors affecting the plan, this does not mean that that liability cannot be calculated and counted as a liability of the debtor. The record in this case contains expert testimony that the debtor's withdrawal liability of $1,007,000 on December 24, 1982, approximated its withdrawal liability on the transfer dates, and that by including that liability on the debtor's financial statements, the debtor was insolvent on the transfer dates. Although including withdrawal liability as a debt may increase the power of the trustee under § 547, this decision is mandated by the law and record in this case.[6]

---

**5.** In *Kessler,* the union sought to have the Debtor's withdrawal liability under the MEPPAA treated as an administrative expense under the Code. *Kessler,* 23 B.R. at 723. In reclassifying the claim as a general unsecured claim, the court rejected the argument that a claim for withdrawal liability accrues upon an employer's termination of operation, and, in fact, implied that it accrues when the benefits vest. *Id.* at 725. The court stated that while the claim may become due and owing on the date of withdraw-

al, calculation of that claim is based on pre-petition factors. *Id.* at 724, 725.

**6.** I recognize that, as a result of my decision, bankruptcy courts may be called upon to make a complex and technical determination of withdrawal liability. This task, however, is not beyond the capabilities of the bankruptcy courts. *Cf. In Re T.D.M.A., Inc.,* 66 B.R. 992, 997 (Bankr. E.D.Pa.1986) (stating that estimations of withdrawal liability under 11 U.S.C. § 502(c) would not unduly delay the closing of the estate and is

Therefore, I will affirm the bankruptcy court's decision to include withdrawal liability as a debt for the purposes of determining the debtor's insolvency under § 547(b) of the Code.

## C. Evidentiary Issues

### 1. *Laventhol and Horwath Report and Expert Testimony*

 The bankruptcy court based its finding of insolvency on both the financial statements prepared by the Trustee's experts and, to a greater extent, the Trustee's experts' testimony that the withdrawal liability of $1,007,000 on December 24, 1982, approximated the Debtor's withdrawal liability on the transfer dates. Since the financial report was not allowed into evidence Century Factors argues that the bankruptcy court was incorrect in relying on the report and any testimony relating to the contents of that report. Century Factors contends that when this evidence is excluded, there is no support for a finding of insolvency.

I find Century Factors' argument unpersuasive. Although the bankruptcy court was in error to base its finding of insolvency on the report which was excluded from the record, there is still evidence in the record to support the court's finding. The Trustee's experts, Mr. Devor and Mr. Portner, testified to the contents of the report, how the Debtor's financial data in the report was prepared, what conclusions were made in the report, and, to some extent, their opinions with respect to the report's contents and conclusions. Without objection to his competence, Mr. Devor explained the report's itemization of the Debtor's assets and liabilities and the manner in which he evaluated them. In addition, Devor identified the Debtor's pension liability, the extent of that liability, and why it was included in the report.

Mr. Portner, the second expert to testify for the Trustee, explained the nature of pension liability, including withdrawal liability, and explained why it should be considered a liability of the Debtor. In light of this testimony, I find that there was support in the record for the bankruptcy court's finding of insolvency and that such a finding was not clearly erroneous.

Century Factors argues that since the report was not allowed into evidence, the expert testimony concerning the contents of the report, its preparation, and any opinions relating thereto should have been excluded. Central to this argument is the Century Factor's belief that the report was not admitted into evidence because it was not prepared in accordance with generally accepted accounting principles. This argument, however, is contrary to both the record and the law. The colloquy between the bankruptcy judge and counsel for the Trustee reveals that the court refused to admit the report because the Trustee's expert had already testified to the contents of the report; therefore, the report was cumulative and unnecessary. N.T. August 21, 1986, at 56. Accordingly, any testimony relating to the contents and preparation of the report is clearly admissible.

In addition, any opinions expressed by the Trustee's expert are also clearly admissible. An expert may testify to an opinion based on information which is not admissible into evidence provided the information is of the type which is reasonably relied upon by experts in that particular field in forming inferences or opinions upon the subject. Fed.R.Evid. 703; *American Bearing Co. v. Litton Indus. Inc.*, 540 F.Supp. 1163, 1169 (E.D.Pa.1982); *aff'd on other grounds*, 729 F.2d 943 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984); *Gregory v. South Hills Movers, Inc.*, 477 F.Supp. 484, 488 (W.D.Pa. 1979). There is nothing in the record which suggests that the information relied upon by the experts in the court below was not of the type relied upon by experts in that field.[7] Accordingly, I find that the expert

---

within competence of bankruptcy court); *In Re Amalgamated Foods, Inc.*, 41 B.R. 616 (Bankr.C. D.Calif.1984) (stating same relying on financial expertise of bankruptcy court).

7. Although there is testimony in the record to suggest that the report prepared by Laventhol and Horwath was not prepared in accordance with accounting principles, a further review of this testimony reveals that any deviation from

testimony was admissible and it was proper for the court to rely on that testimony in making its ruling.

### 2. *Going Concern Value*

■ Century Factors also argues that since Mr. Devor admitted on cross-examination that the Debtor's property was not valued as a going concern in the Laventhol and Horwath report, the wrong standard was utilized in valuing the Debtor's property. Under the Code, a party seeking to avoid a preference must establish the "fair valuation of the Debtor's assets." *See* 11 U.S.C. § 101(26). Normally, "fair value" is the "going concern" value or fair market price. *In Re Bellanca Aircraft Corp.*, 56 B.R. 339 (Bankr.D.Minn.1985). If a company is "on its deathbed" or is nominally in existence, however, application of the going concern value is not appropriate. *In Re Randall Constr., Inc.*, 20 B.R. 179, 198 (N.D.Ohio 1981); *In Re Utility Stationery Stores, Inc.*, 12 B.R. 170 (Bankr.N.D.Ill. 1981). To treat such a company as a going concern would be misleading and would, in fact, fictionalize the company's true financial condition. *In Re Randall Constr., Inc.*, 20 B.R. at 185. I emphasize, however, a business does not have to be thriving to receive going concern valuation. *See In Re Bellanca Aircraft Corp.*, 56 B.R. at 387. Before the going concern valuation is to be abandoned, the business must be "wholly inoperative, defunct or dead on its feet." *Id.*

■ In this case the bankruptcy court did not make a specific finding as to whether the Debtor deserved to be valued as a going concern. The court, however, did say that it considered the Trustee's experts' testimony more reliable than that of the Century Factors' experts and part of the Trustee's experts' testimony was that the Debtor did not deserve to be valued as a going concern.[8] Thus, by relying on the Trustee's expert testimony, the court implicitly adopted the view that the Debtor was not entitled to be valued as a going concern.

I find that the evidence in this case supports a finding that the Debtor was, at best, in a very unstable financial condition with a dubious future at the time of the transfers. Debtor's receivables from its subsidiary and affiliate had to be written down by $417,000 due to the high improbability of collection. Debtor's inventory also had to be written down by $249,000 and its physical assets were reduced by $57,000. In addition, Debtor's liabilities had to be increased by $120,000, exclusive of any increase due to the inclusion of Debtor's pension liability. I find that this evidence supports the Trustee's expert's opinion that the Debtor did not deserve to be treated as a going concern. To do so would be to misrepresent the Debtor's financial position at the time of the transfers.

### D. Prejudgment Interest

On cross appeal, the Trustee contests the bankruptcy court's denial of prejudgment interest on the preference amount. The bankruptcy court denied prejudgment interest because Century Factor's claim, although unsuccessful, "was hardly frivolous and because it was not responsible for the delay in the proceeding."

■ There is no specific provision in the Code or Bankruptcy Rules which entitles a successful Trustee in a preference action to interest.[9] Instead the bankruptcy court

---

these principles was so slight that they would not effect the admissibility of the report. Moreover, these deviations were fully explained by Mr. Devor.

8. Mr. Devor stated that although the Debtor was operating at the time of the transfers, it was not operating very well and, in his opinion, it did not deserve "treatment accounting-wise as a normal going concern." Tr., August 21, 1986. at 38–39.

9. The Code section frequently cited as giving authority to the bankruptcy court to award interest in a preference action is 11 U.S.C. § 550(a). In pertinent part this section provides:

> [e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

must rely on its equitable powers to make such an award. *In Re Independent Clearing House Co.*, 41 B.R. 985, 1015 (Bankr.D. Utah 1984), *aff'd in part, rev'd in part on other grounds*, 60 B.R. 985 (D.Utah 1986). The decision to award prejudgment interest is left to the sound discretion of the bankruptcy court; however, once awarded, interest accrues from the date of demand for the return of the preference or, absent demand, the commencement of the suit. *In Re H.P. King Co., Inc.*, 64 B.R. 487 (Bankr.E.D.N.C.1986); *In Re Independent Clearing House*, 77 B.R. 843, 875 (D. Utah 1987); *In Re Production Steel, Inc.*, 60 B.R. 4, 5 (Bankr.M.D.Tenn.1986); *In Re Roco Corp.*, 37 B.R. 770, 774 (Bankr.D.R.I. 1984); *see also In Re Foreman Industries, Inc.*, 59 B.R. 145, 156 (Bankr.S.D.Ohio 1986) (citations omitted); *In Re Video East, Inc.*, 33 B.R. 61 (Bankr.E.D.Pa.1983) (without discussion, court refused to award interest because it was "unwarranted").

The purpose of awarding prejudgment interest is to compensate the Debtor's estate for the inability to use the property during the time it was in the hands of the transferee, *Foreman Industries, Inc.*, 59 B.R. at 155. Nevertheless, case law suggests that the award of such interest, although frequent, is not automatic. *See e.g., In Re Frigitemp Corp.*, 781 F.2d 324, 325 (2nd.Cir.1986) (interest not awarded to successful trustee in preference action even though requested); *Roco Corp.*, 37 B.R. at 774 (denied request to award interest not contained in previous judgment); *Video East, Inc.*, 33 B.R. at 63 n. 8 (interest award deemed "unwarranted"). In order for the Trustee to prevail on the prejudgment issue, I must have a "definite

conviction that the [bankruptcy] court upon weighing the relevant factors, clearly erred in its judgment," *Independent Clearing House*, 41 B.R. at 1001–02, and that the court neglected to consider a factor which was crucial to its discretion. *Id.* at 1002. Although there is room to disagree with the bankruptcy court's decision, *see e.g., Fulghum Constr. Corp.*, 45 B.R. 112, 121 (Bankr.M.D.Tenn.1984) (rejecting part of reasoning employed by bankruptcy court); *H.P. King Co., Inc.*, 64 B.R. at 489 (same), under the facts of this case, I cannot find that the bankruptcy court abused its discretion in refusing to award interest.

Accordingly, I will affirm the bankruptcy court's decision in its entirety.[10]

---

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
11 U.S.C. § 550(a).
Courts generally rely on the reference to "value," an undefined term in the Code, as giving the authority to award interest. *See In Re H.P. King, Inc.*, 64 B.R. 487, 489 n. 1 (Bankr.E.D.N.C. 1986); *In Re Production Steel, Inc.*, 60 B.R. 4, 5 (Bankr.M.D.Tenn.1986).

**10.** There is also some dispute as to whether the fifth element of a preference action under § 547

has been met. Under this section, the Trustee must prove that the alleged preference allows the creditor to receive more than he would receive if the case were a case under Chapter 7 of the Code, the transfer had not been made and the creditor received payment of such debt as provided under the Code. *See* 11 U.S.C. § 547(b)(5). I find that in its motion for judgment in the lower court, Century Factors admitted that this element of the preference action was satisfied. *See* Defendant's Answer to Trustee's Motion for Judgment, at 1. Having done so, Century Factors cannot now assert a contrary position on appeal.