In re ENERGY COOPERATIVE, INC., Debtor.

ENERGY COOPERATIVE, INC.,

v.

CITIES SERVICE COMPANY, Defendant.

Nos. 81 B 5811, 82 A 3699 and 85 C 3538.

United States District Court, N.D. Illinois, E.D.

July 22, 1991.

Michael L. Shakman, Miller, Shakman, Hamilton & Kurtzon, Michael T. Hannafan, Michael T. Hannafan & Associates, Ltd., Chicago, Ill., for ECI.

Donald L. Mrozek, Hinshaw & Culbertson, Donald E. Johnson, Hollis & Johnson, Chicago, Ill., for Cities Service, Co.

## MEMORANDUM OPINION

KOCORAS, District Judge:

This matter comes before the court on Cities Service Company's motion for summary judgment and the Trustee for Energy Cooperative, Inc.'s cross motion for summary judgment. For the following reasons, summary judgment is granted for the plaintiff in part and for the defendant in part.

## BACKGROUND

This motion arises in an ongoing series of cases brought by Energy Cooperative, Inc's ("ECI") Trustee in Bankruptcy (the "Trustee") for the purpose of recapturing certain payments ECI made to its creditors within the ninety days preceding its filing for bankruptcy.

ECI was formed in 1976 to engage in the business of purchasing crude oil, exchanging it, refining it, and selling the refined products. The essential purpose for the creation of ECI was to assure a supply of refined petroleum products for the eight regional farm cooperatives who owned and formed it. Cities Services Corporation ("Cities"), now known as Oxy, U.S.A., is a corporation that transacted business with ECI in Illinois, Indiana, Michigan, and Oklahoma.

ECI and Cities were parties to an exchange agreement known as Exchange 647 and/or Exchange 679 (the "Exchange Agreement"). This agreement called for ECI and Cities to exchange oil products, with ECI delivering its product to Cities at East Chicago, Indiana, and Cities delivering its product to ECI at Kipling, Michigan. The agreement also provided for book transfers, where the parties would change ownership of oil products in their accounting books. The Exchange Agreement also provided that ECI would pay Cities location and handling differentials for its product delivered to Cities.

In addition, ECI and Cities were parties to a terminalling agreement known as Terminalling Agreement 343 and/or 923 (the "Terminalling Agreement"). This agreement allowed ECI to use Cities' storage tanks in East Chicago, Indiana to store oil products for a specified storage charge.

This proceeding was brought by the Trustee of ECI, claiming a recovery of certain allegedly preferential payments and transfers made to Cities prior to ECI's bankruptcy.

The key to determining whether a debtor's payment to a creditor was preferential lies principally in when the payment in question was made. Specifically, the crucial period is the ninety days immediately preceding the debtor's filing for bankruptcy. The activities of the debtor and creditor during this ninety day period are important not only for determining whether liability exists, but also for determining whether certain affirmative defenses are applicable. Since ECI filed for bankruptcy on May 15, 1981, it is important to understand what transpired between the parties from February 14, 1981 to the filing date.

ECI's trustee alleges that ECI made six transfers to Cities during the ninety day period prior to ECI's bankruptcy in order to satisfy ECI's obligations to Cities under the Exchange and Terminalling Agreements:

a. On May 8, 1981, ECI made an in-tank transfer of 10,000 barrels (420,000 gallons) of product to Cities with a value in excess of $400,000. ECI claims that $209,957 of this payment was preferential;

b. On March 16, 1981, ECI paid Cities $765.55 for differentials owed on transactions under the Exchange Agreement during January 19, 1981.

c. On April 15, 1981, ECI paid Cities $1,240.04 for differentials owed on transactions during the month of February, 1981.

d. On April 28, 1981, ECI paid Cities $1,486.70 for differentials owed on transactions during the month of March, 1981. The Trustee contends that $745.09 of that payment was preferential because it was for deliveries prior to March 15, 1981.

e. On March 16, 1981, ECI paid Cities $30,474.69 in payment of two invoices for storage charges and differentials for the month of January, 1981. The Trustee contends that $29,978.72 of that amount was preferential because it was paid on account of storage and deliveries prior to January 31, 1981.

f. On April 9, 1981, ECI paid Cities $21,700.15 for handling and storage charges for the month of February, 1981. The Trustee contends that $18,954.59 of that amount was preferential as it was paid on account of charges for handling and storage prior to February 24, 1981.

On October 2, 1981, ECI and Cities entered an agreement ("Sale Agreement") whereby Cities paid ECI $54,096.39 to settle Cities' obligations to ECI.

The Trustee now claims that a substantial portion of the above six payments made to Cities were preferential, and thus avoidable. The Trustee requests summary judgment in favor of ECI and against Cities in the amount of $261,264.22, plus prejudgment interest at the rate of 10% from the date of filing of the adversary proceeding (October 14, 1982) to the date of judgment. On the other hand, Cities requests summary judgment in its favor based on a number of defenses to the Trustee's preferential payment claim.

## DISCUSSION

In support of its motion for summary judgment, Cities makes seven main arguments: (1) that the Exchange Agreement was a bailment, and as such, does not involve an antecedent debt. Therefore, the Trustee is unable to prove one of the elements required for a preference; (2) in the alternative, if the Exchange Agreement is a sale transaction, rather than a bailment, the Trustee should be equitably estopped from raising his preference claim because ECI misled Cities into entering the Sale Agreement; (3) Cities has a setoff defense that would provide up to $147,050 to offset the preference alleged by the Trustee; (4) if, however, the court finds that the setoff defense fails due to the Sale Agreement, Cities would be further prejudiced by its signing of the Sale Agreement. Therefore, the Trustee should be estopped from raising his preference claims based on Cities' reliance on the Sale Agreement to settle all claims between the parties; (5) the Exchange Agreement transactions made forty-five days before May 8, 1981, totalling $58,226, were ordinary business transactions, not preferential transfers; (6) Cities provided terminalling services to ECI which were new value that should be deducted from the Trustee's preference claims, pursuant to § 547(c)(4) of the Bankruptcy Code; and finally, (7) ECI had product stored at Cities' terminals during March and April, 1981, which was subject to a lien by Cities. The lien could have been enforced by Cities had ECI not paid for its terminalling services in 1981. As that lien exceeded the amount of ECI's alleged preferences, Cities would not have been overpaid by ECI.

In response, the Trustee also makes numerous arguments. First, the Trustee asserts that the Exchange Agreement was a sale, not a bailment. Next, the Trustee contends that Cities would not have been entitled to any setoff if the book transfer had not been made. The Trustee agrees

with Cities that payments made forty-five days after being incurred are not avoidable as preferential transfers. However, the Trustee contends that Cities improperly counts the forty-fifth day itself in its calculations of which payments fall under the forty-five day rule. In addition, the Trustee asserts that Cities does not have a 'new value' defense because Cities has been paid in full for all goods and services provided to it by ECI. Neither, the Trustee contends, did Cities have a lien on ECI's inventory in Cities' storage. Finally, in negotiating account settlements the Trustee asserts that ECI had no duty to make clear to Cities, though it should have been clear in any event, that ECI had no authority to settle preferential transfer claims. Therefore, Cities' estoppel defense should fail.

## 1. Standard for Summary Judgment

Summary judgment is appropriate if the pleadings, answers to interrogatories, admissions, affidavits and other materials show "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which might effect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). No genuine issue exists "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511. Summary judgment may be granted if the evidence is merely colorable or is not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11.

When a properly supported motion for summary judgment has been made, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* The opposing party is entitled to the benefit of all favorable inferences which can reasonably be drawn from the underlying facts; however, only *reasonable* inferences will be drawn, not every conceivable inference. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987).

## 2. Forty-five Day Rule

With respect to the substantive law applicable to this motion, the general principles are all found within § 547 of the pre–1984 Bankruptcy Code. 11 U.S.C. § 547 (1982) (since amended). Subsection (b), in relevant part, allows a trustee in bankruptcy to recapture any transfer of property by an insolvent debtor to a creditor as payment for a pre-existing debt which was made within the ninety days that preceded the debtor's filing for bankruptcy. 11 U.S.C. § 547(b). Such a transfer is deemed "preferential" and thus is unfair to other creditors who were not paid in the ninety day period. Subsection (c)(2), however, provides an exception to this general rule. Under § 547(c)(2), the trustee is prevented from avoiding an otherwise "preferential transfer" to the extent that such transfer was:

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

The parties dispute the measurement of the forty-five day period. The Trustee contends that the forty-fifth day itself should not be counted, whereas, Cities asserts that the forty-fifth day should be counted. Both parties agree that Cities delivered product to ECI on March 24, 1981 with a value of $10,320, and on May 8, 1981 ECI made a subsequent transfer to Cities. Cities contends that, pursuant to 11 U.S.C. § 547(c)(2)(B), $10,320 of ECI's March 24th transfer is not avoidable as it was made in the ordinary course of business in payment of a debt incurred forty-five days earlier.

In support of their positions, both parties present case law interpreting § 547(c)(2). The Trustee's cases state that the forty-fifth day should not be counted. *Re Georgia Steel, Inc.*, 38 B.R. 829, 836 (Bkrtcy.Ga.

1984); *In re Transpacific Carriers Corp.,* 50 B.R. 649, 651 (Bkrtcy.S.D.N.Y.1985). On the other hand, Cities' cases state that the forty-fifth day itself should be counted. *In re A. Fassnacht & Sons, Inc.,* 45 B.R. 209, 219 (Bkrtcy.E.D.Tenn.1984); *In re Hersman,* 20 B.R. 569, 574 (Bkrtcy. N.D.Ohio 1982). However, none of these cases are directly on point as none involved transactions made on the forty-fifth day. All of the transactions were made before the forty-fifth day or after the forty-fifth day. Therefore, the courts' discussions concerning whether the forty-fifth day should be counted were extraneous to their rulings.

■ Still, our own reading of the language of § 547(c)(2)(B) convinces us that the *Fassnacht* and *Hersman* interpretations of § 547(c)(2)(B) are more persuasive. § 547(c)(2)(B) states that the debtor may not reach ordinary transfers from a debtor "made *not later than* 45 days after such debt was incurred ..." (emphasis added). The statute could have stated "before 45 days" or "prior to 45 days." However, it does not. We interpret "not later than 45 days" to mean that the forty-fifth day should be counted. Accordingly, Cities' forty-five day rule defense should be applied to $10,320 of the March 24th transfer.

### 3. Bailment Argument

ECI and Cities were parties to an Exchange Agreement which provided that ECI deliver a specified quantity of oil and gasoline to Cities, and that Cities deliver the same quantity of petroleum products to ECI. The Exchange Agreement also provided, in part:

1. EXCHANGE: Unless the contrary is provided by the express terms hereof, this Agreement constitutes an even and current exchange of products and each party will endeavor to keep the exchange in reasonable balance at all times. If at any time, or from time to time, this exchange shall be out of balance in an amount which the party who has delivered in excess of the quantity which he has received considers to be unreasonable, such over-delivered party shall have the right to either (a) suspend further deliveries or (b) limit the amount of further deliveries to be made by it until such times as the deliveries to each party have been brought into approximate balance. Upon termination, if the exchange is not in balance, the over-delivered party may continue to draw from the other party until the exchange is brought into balance. If the exchange cannot thus be brought into balance, settlement will be effected by delivery of products at some other destination or destinations or cash settlement will be made, in either instance on terms to be mutually agreed upon.

6. TITLE: Title to products delivered into tank trucks, barges, tanker, terminals or pipe lines shall pass when and as the products pass the intake pipe of such facility, and title to products delivered into tank cars shall pass when the carrier accepts such tank cars for shipment. From the time of delivery by one party to the other of products under this Agreement, the recipient party shall be solely responsible for loss, damage or expense to members of the public for personal injuries including death of, or property damage, caused by possession, consumption or use of the products exchanged under this Agreement.

8. TAXES: Unless otherwise provided herein or required by law, any direct taxes or other direct governmental charges and fees upon the delivery of the products hereunder, imposed by Federal, state or local governments, shall be for the account of the receiving party and such receiving party for such direct taxes, charges or fees required to be paid by such delivering party in respect to delivery of such products by it ...

9. WARRANTY: Each party warrants title to the products delivered hereunder by such party, that such party has the right to sell such product and that it is free from liens and adverse claims of every kind ...

■ Cities now asserts that the Exchange Agreement was a bailment contract, not a contract for sale, and therefore,

title to the disputed products never passed to Cities. However, we find that the unambiguous terms of the Exchange Agreement and prior holdings by this court establish that the intent of the parties was to effect sales.

To begin, under the Exchange Agreements in issue, ECI was to deliver a certain quality and quantity of petroleum products to Cities and Cities was to deliver a certain quality and quantity of petroleum products to ECI. The parties agreed to maintain the volume delivered by each party to the other in reasonable balance and to invoice any small balance owing to either party at the termination of the agreement at a mutually satisfactory price. The agreements further provided that title to the products delivered would pass to the receiving party when the product passed a designated delivery point and that taxes or other governmental charges on delivery would be the responsibility of the receiving party. Additionally, the agreement provided that, from the time of delivery, the recipient party was solely liable for any harm to the public caused by the product; that each party warranted title to the product it delivered; and that each party would pay all sums due on the production, processing, or handling of the products it delivered and would indemnify the recipient party against any charges upon the product on account of adverse claims thereto or of royalties applicable before or upon delivery.

Those provisions taken as a whole clearly establish that it was the intent of the parties under each agreement to sell a quantity of that party's product for the price of a quantity of the other party's product. Under this arrangement either party could be seller/creditor or buyer/debtor at any given time depending on the balance of the exchanges. Nothing in the agreements could be construed as limiting the recipient party's right to deal with the products delivered in any manner it pleased, nor as reserving a right in the delivering party to reclaim the product once delivered. Rather, the agreement expressly and unambiguously provides that title to the product, as well as liability for taxes, delivery charges, and public harm—in other words, owner-

ship—would pass to the recipient party at a defined point of delivery. Because there is a transfer of title to the product delivered the transfer relationship is regarded as a sale in our system of jurisprudence. *See* 8 Am.Jur.2d *Bailments* § 48 (1980).

Moreover, in a related case with substantially the same Exchange Agreement we previously found the language of the Exchange Agreement evidenced the parties' intent to sell, not bail, the product. *In re Energy Co-op., Inc.,* 94 B.R. 975, 979 (N.D.Ill.1988). Accordingly, Cities' bailment defense must fail.

### 4. Lien Defense

■ Cities asserts a carrier's lien and a warehouseman's lien to overcome part of the Trustee's preference claim. For the following reasons, we find that Cities has a valid warehouseman's lien, but no carrier's lien.

Cities' claim that it had a carrier's lien under § 7-307(1) of the Uniform Commercial Code must fail because Cities is not a carrier. A carrier is someone who transports goods or persons. *See e.g. Meyer v. Rozran,* 333 Ill.App. 301, 77 N.E.2d 454, 457 (1st Dist.1948) (a private carrier is one who transports property); 13 C.J.S. *Carriers,* § 2, p. 25. Cities was not hired by ECI to transport goods or passengers. The Terminalling Agreement provided only that Cities receive and store ECI's product.

However, we do find that pursuant to Indiana law, Cities had a warehouseman's lien over ECI's goods placed in Cities' storage. Both parties agree that Indiana law governs the Terminalling Agreement because Indiana was where the contract was performed and the product in question was located. Indiana Code Annotated § 32-8-35-1 provides as follows:

All person, firms and corporations engaged in the business of storing, warehousing and forwarding of goods, wares and merchandise shall have a lien upon all goods, wares and merchandise left with them for storage, warehousing or forwarding, to the extent of the value of such services of storage, warehousing or forwarding, ... Provided, however, that

such goods shall remain in the possession of said person, firm or corporation so engaged in said business.

Ind.Code Ann. § 32–8–35–1 (Burns, 1985).

The Trustee contends that the court should not consider Cities' warehouseman's lien argument because it was raised by Cities for the first in its reply brief. However, because Cities' brief which raised this issue was a reply and response memorandum and ECI had an opportunity to and did respond in detail to the argument, we find no prejudice to ECI and no need to bar Cities' argument.

It is clear the Cities was engaged in the business of storing ECI's product in the spring of 1981. It is also undisputed that ECI made payments to Cities for storage related services during the ninety days prior to bankruptcy. ECI now claims that these payments were preferential. Cities contends that if ECI had not made the alleged preferential payments, Cities would have held on to ECI's product on May 15, 1981, pursuant to the Indiana warehouseman's statutory lien. Cities then could have sold ECI's product to satisfy the balances ECI owed Cities for storage.

Cities has supplied the affidavit of Floyd Diacon as proof that during March and May of 1981, ECI product in Cities' storage exceeded $1,800,000. The Trustee contends that under Indiana law Cities must show that it retained possession of sufficient quantities of ECI's product from the time that Cities first performed services for ECI (January, 1981) until the filing of ECI's bankruptcy on May 15, 1981. Indeed, § 32–8–35–1 states that "such goods shall remain in the possession of said person, firm or corporation so engaged in said business." We find that such large quantities of product in Cities' storage, close to $2,000,000 worth of product, makes it highly unlikely that ECI's product ever dropped below $52,174.84 (the alleged preferential payment for storage). Nor does the Trustee assert that the product actually fell below this figure. We are convinced that during the relevant period, ECI's product in Cities' storage was above $52,174.84.

Cities further asserts that because of its lien option, it was not preferred to ECI's other creditors. Cities contends that Indiana statute avoids the priority issue. Indiana Code Annotated § 26–1–9–310 provides:

> When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise.

This statute was applied in *In re Stookey Holsteins, Inc.*, 112 B.R. 942 (Bkrtcy. N.D.Ind.1990), to give a statutory lien holder priority over the holder of a prior perfected security interest:

> In this case Select [the statutory lien holder] held a perfected artisan's lien in the debtor's embryos which were in its possession from the moment the debtor failed to pay it for its service in producing and storing the embryos. Thus, even though Midwest [bank and holder of perfected security interest] may hold a security interest which was perfected prior to the time Select obtained its lien, under Indiana law the court finds that Select's lien is superior to Midwest's interest. *Id.* at 950.

Similarly, in the present case the lien was tied to storage services, and thus, the lien would have priority over prior perfected security interests. Accordingly, Cities' warehouseman's lien will be allowed to decrease ECI's preference claim by $52,-174.84.

### 5. New Value Defense

Cities asserts that if the court finds a lien Cities still has a new value defense that can be applied to the three exchange differential payments identified by ECI on March 16, 1981; April 15, 1981, and April 28, 1981. Cities contends, and the Trustee does not dispute, that the pro-ration of terminalling services provided by Cities for the first seven days of May, 1981 are the daily pro-ration of $495.97 times 7 =

$3,471.79. This new value, Cities asserts, exceeds the exchange differential payments for March and April which totalled $2,750.68. In addition, Cities asserts that it provided ECI with terminalling services for the first seven days of May, 1981 daily prorationed at $495.97 times 7 = 3,471.79. Cities requests that this amount be applied as new value to the ECI's May 8, 1981 preferential exchange transaction of $257,463. We compute the total new value claimed by Cities to be $3,471.79 + 3,471.79 = $6,943.58.

The Trustee does not dispute these calculations. Rather, the Trustee argues that Cities' new value defense is barred because Cities was paid in full for any new value given and because the new value was secured by a lien.

The Bankruptcy Code, 11 U.S.C. § 547(c)(4), provides:

(c) The trustee may not avoid under this section a transfer—

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

The policy behind allowing a new value defense is to encourage creditors to continue to extend credit to a financially distressed debtor up to the date that the debtor files bankruptcy. This is accomplished by allowing those creditors a benefit in the form of a new value defense to prior preferential transfer claims. *See In re Almarc Mfg., Inc.,* 62 B.R. 684, 688 (Bkrtcy.N.D.Ill. 1986). Therefore, under § 547(c)(4) Cities could offset against ECI's preferential payments the transactions which resulted in new value to ECI after a preferential transfer, unless the new value was secured or repaid in full by ECI. *See In re Prescott,* 805 F.2d 719, 731 (7th Cir.1986) (A creditor raising a § 547(c)(4) defense to a preference action "has the burden of establishing that new value was extended, which re-

mains unsecured and unpaid after the preferential transfer").

The Trustee argues that Cities' new value was repaid in full by the Sale Agreement. The Trustee asserts that the Sale Agreement allowed Cities to deduct $83,304.48 from its payment to ECI all money due Cities under the Exchange and Terminalling Agreements for the period of March through September, 1981.

■ However, the requirement that the new value remain unpaid applies only through the date of the filing of the bankruptcy petition. "Additional post-preference unsecured credit must be unpaid in whole or in part *as of the date of the petition.*" *Almarc,* 62 B.R. at 686 (emphasis added). *See also In re New York City Shoes, Inc.,* 880 F.2d 679, 680 (3rd Cir.1989) ("[T]he debtor must not have fully compensated the creditor for the "new value" to the debtor *as of the date that it filed its bankruptcy petition*" (emphasis added)). Neither of the Trustee's cases cited on this matter challenge our application of the statute, as both involve repayment of the new value pre-bankruptcy. *In re Prescott,* 805 F.2d 719, 722–3 (7th Cir.1986); *In re Saco Local Dev. Corp.,* 30 B.R. 859, 861–2 (Bkrtcy.D.C.Me.1983). Therefore, we will not use the post-bankruptcy transactions between Cities and ECI to limit Cities' pre-bankruptcy new value defense.

■ Next, ECI argues that Cities' new value is not a valid § 547(c)(4) defense because it is protected by a lien which is a security interest. Section 547(c)(4) does require that the new value remain unsecured. However, Cities' warehouseman's lien is not a security interest.

Under 11 U.S.C. § 101(47) (West 1990) a statutory lien is defined as a "... lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute; ..." The essence of the definition of a statutory

lien "is the need or lack of it, for an agreement to create the lien. If the lien arises by force of statute, without any prior consent between the parties, it will be deemed a statutory lien ... [i]f the creation of the lien is dependent upon an agreement, it is a security interest even though there is a statute which may govern aspects of the lien." 2 Collier on Bankruptcy § 101.53, at 101-52 (15th ed. 1991). *See also In re H & S Transp. Co.*, 45 B.R. 233, 237-38 (Bkrtcy. M.D.Tenn.1984). As Cities' warehouseman's lien arose by statute and not by agreement it is not a security interest. Since the lien is not a security interest, Cities' new value defense falls inside the scope of § 547(c)(4).

### 6. Setoff Defense

Cities also asserts that any recovery by the Trustee should be reduced by permitting Cities to setoff the amount of the contract balance in ECI's favor on the Exchange Agreement as of the date of bankruptcy. We find that the setoff cannot be allowed.

The Bankruptcy Code, 11 U.S.C. § 553 provides:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...

(b)(1) Except with respect to a setoff of a kind described in section 362(b)(6) or 365(h)(1) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the latter of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

■ Cities asserts that May 8, 1981 began with a balance of $257,463 owed to Cities under the Exchange Agreement. Then on that date ECI made a book-in-tank transfer to Cities with a value of $404,513, resulting in Cities owing a balance to ECI. Cities' debt to ECI under the Exchange Agreement did not substantially change between May 8, 1981, until the date of ECI's bankruptcy on May 15, 1981, when Cities owed ECI $147,050 under the Exchange Agreement. Cities contends that under § 553(a) it should be allowed to offset the $147,050 it owed ECI on the date of bankruptcy against ECI's preferential transfer claims.

However, as the Trustee point out, any right that Cities might have to setoff its debt to ECI against ECI's obligation to it is subject to the limitation of § 553(b). "§ 553(b) states that where a setoff occurs within 90 days of bankruptcy, the trustee (or in the case under Chapter 11, the debtor-or-in-possession) may recover the amount of setoff to the extent that such insufficiency, as of the date of setoff, is less than the insufficiency existing 90 days prior to the date the bankruptcy petition was filed. 'Insufficiency' means an amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim." *In re Brooks Farms*, 70 B.R. 368, 372 (Bkrtcy.E.D.Wis. 1987). This requires a mathematical comparison of the insufficiency ninety days prior to the bankruptcy filing with the insufficiency on the date that the setoff was exercised (in this case May 15, 1981). *Id.*

Cities also argues that the Trustee has failed to prove that the May 8th transfer was for a mutual debt. However, we will not view the May 8th transfer as an isolated transaction. Under the Exchange Agreement ECI and Cities made numerous and ongoing transfers. The party indebted to the other transferred back and forth repeatedly. Because the May 8th transaction was governed by the Exchange Agree-

ment, we will look at the totality of the circumstances to find an "insufficiency" for Cities on May 8th.

Both parties agree that on the 90th day prior to ECI's bankruptcy, ECI owed Cities $131,869 more than Cities owed ECI. This would give Cities an "insufficiency" of $131,869. On the date of ECI's bankruptcy Cities' "insufficiency" was a negative $147,050 as Cities owed ECI $147,050 and ECI owed Cities nothing. On the date of bankruptcy Cities' "insufficiency" was therefore almost $280,000 less than it was on the 90th day prior to bankruptcy ($131,-869–147,050). Therefore, § 553(b) would render Cities' setoff under § 553(a) avoidable.

### 7. Estoppel Argument

Cities asserts that the Trustee should be equitably estopped from bringing its preference claims against Cities because ECI led Cities to believe that Cities' payment of $54,906.39 under the Sale Agreement settled all claims between the parties. The Trustee responds that it made no misrepresentations to Cities and the Bankruptcy Court's order should have put Cities on notice that ECI did not have authority to settle any preference claims.

█ The elements of equitable estoppel in this circuit are as follows:

First, the party to be estopped must know the facts. Second, this party must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has a right to believe it is so intended. Third, the party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct to his substantial injury.

*Portmann v. United States*, 674 F.2d 1155, 1167 (7th Cir.1982) (quoting *TRW, Inc. v. F.T.C.*, 647 F.2d 942, 950–51 (9th Cir.1981); *See also Azar v. United States Postal Service*, 777 F.2d 1265, 1268 (7th Cir.1985).

█ Cities contends that ECI failed to inform it that ECI had no authority to settle preference claims. The Trustee admits that ECI did not discuss with Cities its lack of authority to settle preference

claims. However, as the Trustee points out, estoppel cannot be based upon silence unless the party to be estopped had a duty to disclose something. "Estoppel, 'when inferred from silence, must include a change of position and reliance on the silence and an obligation or duty to speak out.'" *Chemetron Corp. v. McLouth Steel Corp.*, 522 F.2d 469, 473 (7th Cir. 1975) (quoting *Bivans Corp. v. Community Nat. Bank of Pontiac*, 15 Mich.App. 178, 166 N.W.2d 270 (1968)); *See also Woodstock/Kenosha Health Center v. Schweiker*, 713 F.2d 285, 290 (7th Cir.1983). In the present case, Cities has failed to establish that ECI had a duty to speak out.

Moreover, we do not find Cities' reliance on ECI's silence reasonable. The bankruptcy order which ECI gave to Cities did discuss the limitations of ECI's authority. The relevant portions of the order as amended, are as follows:

1(ii) to negotiate and agree with each of the Exchange Partners upon a final settlement and liquidation of the obligations remaining under each respective Exchange Agreement;

and 1(iii) where appropriate, to adjust and compromise any disputed amount or obligations owing under the Exchange Agreements, provided, however, that the Debtor has no authority to settle, adjust or compromise any claim, cause or right, which claim, cause or right could form the basis of any cause of action which may be brought pursuant to any avoiding or recovery provisions of the *Bankruptcy Code*.

We believe that this order should have put Cities on notice that ECI did not have full authority to settle all claims. This order should have caused Cities to inquire into the extent of ECI's authority. Cities' reliance on ECI's silence was not reasonable. Accordingly, we will not equitably estop the Trustee from bringing his preference claims.

### 8. Prejudgment Interest

The Trustee claims entitlement to prejudgment interest from the date of suit through the date of judgment at the rate of 10%. Cities contends that interest is not

warranted because it is not responsible for any delay is resolution of this case. We find prejudgment interest to be appropriate in this case.

 Whether to grant prejudgment interest and the rate of interest are within the court's discretion. *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 439 (7th Cir.1989); *In re Video East, Inc.*, 33 B.R. 61, 63 n. 8 (Bkrtcy.E.D.Penn.1983); *In re Art Shirt Ltd.*, 93 B.R. 333, 342 (E.D.Pa.1988). The purpose of awarding prejudgment interest is to compensate the debtor's estate for its inability to use the money or property during the time it was in the transferee's possession. *Art Shirt*, 93 B.R. at 342. The award of such interest is frequent, though not automatic. *Id.* In the present case, we will award the Trustee prejudgment interest on the preferential transfers recovered from Cities at 10% per annum from the date the case was filed until the date of this order.

### CONCLUSION

In conclusion, the Trustee's preference claim against Cities of $261,264.22 is granted in part. This court finds a reduction of $10,320 proper pursuant to Cities' forty-five day rule defense. In addition, we find reductions of $52,174.84 and $6,943.58 proper pursuant to Cities' lien and new value defenses. Accordingly, the Trustee's preference claim is adjusted to $191,825.80 and awarded with prejudgment interest of 10%. It is so ordered.