In re A. FASSNACHT & SONS,
INC., Debtor.

Richard P. JAHN, Jr.,
Trustee, Plaintiff,

v.

READING BODY WORKS,
INC., Defendant.

Bankruptcy No. 1–80–02267.
Adv. No. 1–81–0859.

United States Bankruptcy Court,
E.D. Tennessee.

Dec. 20, 1984.

Richard P. Jahn, Jr., Tanner, Jahn, Anderson, Bridges & Jahn, Chattanooga, Tenn., for plaintiff.

Leonard P. Goldberger, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., and William Crutchfield, Jr., Chambliss, Bahner, Crutchfield, Gaston & Irvine, Chattanooga, Tenn., for defendant.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

A. Fassnacht and Sons, Inc., was a truck equipment dealer in this city for many years before November 12, 1980, when it filed a petition in bankruptcy for reorganization under chapter 11 of the Bankruptcy Code. Reorganization became unlikely, and on April 16, 1981, the case was converted to a liquidation case under chapter 7 of the Code. Richard P. Jahn, Jr., was appointed trustee in bankruptcy. He brought this suit against Reading Body Works to recover alleged preferential payments by Fassnacht to Reading in the 90 days before the date on which Fassnacht filed its bankruptcy petition.

Reading was a supplier of Fassnacht. Reading and the trustee are generally in agreement on the details of when deliveries were made by Reading and when payments were made by Fassnacht in the 90 days before bankruptcy. Technical questions about the timing of payments relative to deliveries can be put to the side while the court considers Readings' main defense.

The trustee can recover a preferential payment only if the debtor was insolvent when it made the payment. 11 U.S.C. § 547(b)(3). Reading contends that none of the payments in question were preferences because Fassnacht was solvent during the entire 90 days before its bankruptcy.

■ Bankruptcy Code § 547(f) provides a presumption that Fassnacht was insolvent during the 90 days before its bankruptcy. Under Rule 301 of the Federal Rules of Evidence, the presumption gave Reading the burden of going forward with evidence to rebut the presumption but did not shift the burden of proof from the trustee to Reading. In other words, the trustee must prove insolvency in order to recover but had the aid of a presumption.

■ In light of Fassnacht's bankruptcy, solvency may appear to be an unusual defense. However, solvency for purposes of the preference statute is determined by a balance sheet test. 11 U.S.C. § 101(26). Did the debtor's assets exceed its liabilities? Reading contends that Fassnacht's assets were worth more than its liabilities during the time in question but Fassnacht was forced into bankruptcy because of a cash flow problem. According to Reading, a slump in business caused Fassnacht's current income to fall below the amount it

needed to pay its debts, but Fassnacht's assets were still worth more than the total of its debts.

The ninetieth day before November 12, 1980, was August 14, 1980. That was the first day of the preference period. The question is whether Fassnacht was insolvent from August 14, 1980 through November 11, 1980.

### The Witnesses

Charles Strain is a certified public accountant with the accounting firm of Hazlett, Lewis & Bieter, which did Fassnacht's accounting from the middle to late 1960's up to the time of bankruptcy in November, 1980. Its work included preparation of annual financial reports and tax returns, routine business matters, and other occasional consultations.

John Fassnacht was president of the company when it filed its bankruptcy petition in November, 1980. His education was in business administration with an emphasis on accounting. He worked in accounting for the company in the 1950's, became office manager in 1962, and became president in 1965. He bought the company's first bookkeeping machine and also the machine it was using in 1980. He testified that he was familiar with all aspects of the company's monthly financial statements and discussed with Charles Strain every item of the annual reports and the profit and loss statements. Charles Strain also testified that John Fassnacht had excellent knowledge of the company's finances.

Rick Fassnacht is the son of John Fassnacht. In 1980, he was vice president of the company, a stockholder, and a director. In 1979 and 1980, he was in charge or ordering inventory and supplies—whatever the company needed for day-to-day operation. In 1980, he was not continuously at the place of business in Chattanooga. He went to Kingsport in April, 1980, to open a branch operation there, but returned to Chattanooga in June. He had been with the company for 10 years when it filed its petition in bankruptcy.

Darrell "Chip" Misgen is the son-in-law of John Fassnacht. He is a psychologist by profession, but in June, 1980, he took a summer job at Fassnacht as a salesman. John Fassnacht discovered that Mr. Misgen was good at mathematics and moved him from sales to a job of keeping up with some financial information, accounts receivable and payable in particular. Before summer's end, Mr. Misgen became financial manager, which apparently means that he was in charge of gathering and compiling the company's financial information.

James Foster is a certified public accountant with the firm of Payne, Miller, and Oliphant. For seven and one-half years before the trial, he had specialized in accounting in bankruptcy cases. He had been involved in about 40 bankruptcy cases. He was hired by the trustee in October, 1982. He acquired his information concerning the company's finances in 1980 by reviewing its records, the bankruptcy petition, the deposition of Chip Misgen, and the testimony of Mr. Misgen and the other witnesses.

The trustee himself also testified on several matters.

### The Evidence

In 1979 and for some time previously, Fassnacht used a small computer for its bookkeeping. Apparently information could be entered on a day-to-day basis, and the machine would do the necessary adding and subtracting and give back totals. However, no one testified that this was exactly how or why the machine was used. The machine would produce a trial balance from the information it was given.

John Fassnacht testified that the company discovered a problem with the machine's inventory calculations. The machine balance at the end of 1979 was $76,000 more than the amount shown by an actual physical inventory check. After that Mr. Fassnacht did not trust the machine to give an accurate account of inventory.

Charles Strain testified that the machine overstated assets depending on the time of

the month when a trial balance was taken from the machine.

John Fassnacht took steps to assure that the company would have an accurate account of inventory. He ordered regular physical inventories. These were not full-scale, detailed inventories like an end of the year inventory. They were spot checks, but according to John Fassnacht, they were still accurate enough to show what came in and what went out. One inventory was done in April, 1980, and another in June or July, 1980.

John Fassnacht's testimony was somewhat confusing as to how inventory accounting was done after the machine error was discovered. The testimony on direct examination is worth setting out:

Question: How about the compilation of your current inventories? Was that bookkeeping data kept current on the machine from the period of September, 1980, through November 12, 1980?

Answer: No, sir. The inventory items would be reduced by the entry of the accounts payable [receivable?]. Now, this accounts payable [receivable?] entry consisted of about eight different entries. If we had had to do this by hand, it would've been very difficult. We were sure that that was true. So what we started doing is just let the inventory ride on the machine and keep accounts payable separate. Whenever we could get accounts payable on the machine, we would do it but we never trusted the accounts payable—I mean the inventory recorded.

Now, at the end of each month during that period when we found out this [inventory] was incorrect, Loretta, the bookkeeper, would take—we would take the figure off the machine. We would add to it by the hand records that had been kept by Chip. He was keeping accounts payable.

We knew what items of accounts payable had to go into inventory. They very seldom ever got around to getting put on the machine. We just didn't trust it so we had two figures there that we had to add together to come up with our inventory figure.

Apparently the company started with the inventory figure from the physical inventory for the end of 1979. It was put into the machine and the machine was still used for a short time. Thereafter accounts payable were kept by hand and the amount from the machine was increased by the appropriate accounts payable. This sum was reduced by the amounts for accounts receivable, which were kept on the machine. The total was then checked against the physical inventory and adjusted if necessary. This produced a final figure that was considered accurate and used for later calculations.

John Fassnacht testified that obsolete items of inventory were not included in the inventory valuation for the end of 1979. A record of the items was kept in the event they might be needed, but they were not assigned any value. Rick Fassnacht also testified that obsolete inventory was not included in inventory valuations in the three months before bankruptcy.

The company's annual financial statement for 1979 says that inventory was valued at the lower of cost or market value. In fact, inventory was valued at what Fassnacht paid for it, price plus shipping charges.

Equipment used by the company and other tangible, depreciable assets were valued at book value. Book value was the original cost less the accumulated depreciation. The depreciable property included building improvements, shop and office equipment, automobiles, rental property, and the like. John Fassnacht considered the book value to be an accurate estimate of the value of the property listed in the depreciation schedule dated July, 1980.

Chip Misgen testified that confusion reigned in the finances and financial information of Fassnacht. He confirmed his earlier statement that there was no logical flow of financial information in the business. Furthermore, the woman who put the information in the bookkeeping machiner could not always identify the source of

the information or explain why she entered it as she did.

Fassnacht's annual financial statement for 1979 showed assets at $403,000, after subtracting the $76,000 excess in the bookkeeping machine's inventory account. The 1979 statement was not audited by Fassnacht's accountants. They used information furnished by Fassnacht as to the value of assets. The financial statement was not presented to Fassnacht's board of directors until June, 1980.

In the summer of 1980, another equipment dealer, Fontaine, was considering buying Fassnacht as a going concern. They wanted a written financial statement and they wanted it quickly. Chip Misgen was in charge of compiling the information. He thought that the bookkeeping machine overstated inventory and asked for a quick physical inventory. Preparation of the balance sheet that was sent to Fontaine took only three days, including the taking of the physical inventory. Chip Misgen said that he and the others involved in getting the balance sheet together did not take the time to be as accurate as they could because Fontaine wanted the statement quickly and intended to do its own on-the-premises investigation of Fassnacht.

The balance sheet was dated August 29, 1980 but actually followed a trial balance dated August 31. The trial balance was generated by the bookkeeping machine and was used in preparing the balance sheet.

One asset entry on the trial balance is "Inventory Equipment". This represented the value of the expensive "big ticket" equipment that was held for sale. The machine trial balance gave a value of almost $252,000. Beside this figure is a handwritten note by Chip Misgen or Charles Strain saying that the amount should be ("S/B") about $69,500. The balance sheet sent to Fontaine used a figure of about $69,500, rather than the larger amount.

Chip Misgen testified that the smaller figure represented a forceful reduction in value that he made because he thought the machine inflated inventory values. Charles Strain testified that he didn't intend the figures on the trial balance to be final.

On reconsideration, Chip Misgen concluded that $69,500 was too low because it left out some assets and undervalued others. He estimated that $120,000 would be closer to the correct value.

Chip Misgen admitted that he had no experience in valuing the business's inventory. John and Rick Fassnacht both disagreed with the inventory valuations on the August balance sheet. Rick Fassnacht said that some items were left out and others were undervalued. John Fassnacht testified that the inventory amounts were much too low.

Chip Misgen testified that he also disputed the valuation of the parts inventory by the parts manager. The parts manager had become manager early the month before. He did not feel comfortable with the prior parts valuation and reduced it considerably to what he thought the parts were worth.

Chip Misgen sent Fontaine a letter in early October, 1980, saying that the August balance sheet should be increased by $16,000 for inventory bought at auction during 1984, but omitted from the balance sheet.

Fassnacht had a subsidiary, AFS, that did not operate separately and had an inventory of brass fittings, hoses, and the like. Fassnacht also sent out items on consignment. Rick Fassnacht testified that the August balance sheet omitted AFS's inventory worth $18,000 to $20,000. He didn't know if the balance sheet included or omitted the consignment inventory, which he valued at about $20,000. Chip Misgen didn't recall if the AFS inventory or the consignment inventory were included or omitted. None of the balance sheet entries is identified as consignment or AFS inventory.

The August, 1980 balance sheet requires some explanation in order to get an accurate picture of the company's assets.

It included in assets $160,000 from the sale of the building where Fassnacht had formerly done business. The building was subject to a mortgage held by Suzanne Fassnacht to secure a debt of $100,000 and to a federal tax lien for $20,622, both of which were paid from the sale proceeds.

The book value of rental property, about $23,401, was listed as an asset but not included in the total. Apparently it was deleted because the rental property was the building that was sold. In effect, the $160,000 sale proceeds were substituted for the book value of the rental property.

Including the $160,000 in the assets and deducting the rental property makes the assets total $481,655. The balance sheet total is $159,998 less because it excludes the $160,000 and includes a $2 mistake.

In short term liabilities, property taxes are listed as $4,509 less $2,640 for a total of $1,869, which is included in the liabilities. The $2,640 appears to be taxes actually paid when the old building was sold.

In long term liabilities, there is an entry of $14,286 for a real estate note to American National Bank and $100,000 for a note to Suzanne Fassnacht. Both of these are excluded from the balance sheet total of long term liabilities which is $22,909. Apparently the $100,000 note represents the secured debt to Suzanne Fassnacht that was paid when the building was sold.

The $14,286 note apparently was also secured by the building and was paid from the proceeds. The closing sheet shows that the bank was paid $26,642 from the proceeds. The testimony was that the bank was owed $125,000 after the sale of the building, and that $125,000 is shown in short term liabilities. The amount of the debt appears to have been $16,667, rather than $14,286, since the larger amount was paid.

If the $160,000 from the sale of the building is included in assets, the liabilities should include the $100,000 debt, the $16,667 debt, and the $2,640 in taxes.

The total liabilities would be $515,052 against the total assets of $481,655, for a deficit of $33,397.

The balance sheet after sale of the building and disposition of the proceeds would leave out the $160,000 in assets, the $2,640 in property taxes, and the debts of $100,000 and $16,667 paid from the $160,000. This gives a worse picture of Fassnacht's financial condition. Assets total $321,655 against liabilities of $395,745, for a deficit of $74,090.

The court did not add back the book value of the rental property because it apparently was the building that was sold. The court could substitute for book value the cash that Fassnacht received from the sale, which was $2,995. This would increase assets and reduce the deficit to $71,095.

The reason for the difference between this amount and the lower deficit figured earlier is that including the $160,000 appears to give Fassnacht a net gain on the sale of $40,693 when in fact it received only $2,995.

The trustee argued that the deficit was actually greater because liabilities did not include federal taxes of $20,622 paid when the old building was sold.

The IRS filed a notice of lien to secure the taxes in July, 1980. Charles Strain testified that he reviewed the tax claim and determined that it was owed. John Fassnacht, however, was of the opinion that the debt was not owed. The IRS never furnished the data to back up the claim. He also thought that the IRS had failed to give Fassnacht credit for some tax payments. A refund claim was not pursued because at the time everyone was busy just trying to keep the business going. Chip Misgen also testified that he didn't believe the tax assessment was correct.

The court accepts the accountant's conclusion that the taxes were owed. However, the court's calculations up to this point have in effect reduced Fassnacht's assets by the amount of the debt and delet-

ed the debt from liabilities. The result is that the deficit is still about $71,000.

Mr. Foster deducted from the asset part of the August balance sheet leasehold improvements valued at about $25,000. He deducted them because in his opinion they would have no value in a liquidation. Fassnacht leased the real property. The improvements were a metal building on a concrete slab that, according to Mr. Misgen, could not be removed and sold separately from the land which was leased. The improvements in question would go to the lessor since they could not be removed without damage to the freehold.

Mr. Foster also deducted prepaid insurance in the amount of about $2,900 because Mr. Misgen said it did not exist.

Mr. Foster did not give any value to goodwill despite the testimony of John and Rick Fassnacht and Chip Misgen that the company had a going concern value of $50,000 to $70,000. Mr. Foster said that goodwill of $50,000 would be recorded as an asset or capital by the purchaser of a business who paid $50,000, assumed the business's liabilities and acquired its assets, but goodwill is not an asset that has value in liquidation. Furthermore, he thought the facts showed that the business had no goodwill.

About $6,600 should be added to the assets by valuing office and shop equipment at about $30,000, rather than $23,400 as stated in the balance sheet. At the bankruptcy auction in June, 1981 the shop and office equipment sold for about $29,500. Rich Fassnacht thought that it was worth $30,000 to $35,000. James Foster testified that shop and office equipment generally sells well at bankruptcy auctions.

Mr. Foster admitted that the August balance sheet was mathematically incorrect. However, he considered the amounts stated to be accurate but simply not recorded on the balance sheet according to proper accounting methods. He concluded that the solvency of Fassnacht at the end of August, 1980, depended on the valuation of its assets, especially inventory, rather than on how the August balance sheet was structured.

Beginning with the $71,000 deficit figured earlier, Fassnacht was insolvent at the end of August, 1980, in an approximate amount of $92,000, if the leasehold improvements, goodwill, and prepaid insurance are excluded from assets and $6,600 is added to the value of office and shop equipment.

Reading also disputed the inclusion in liabilities of $29,000 in notes payable to officers of Fassnacht. These were not listed in full as debts in the bankruptcy schedules and no proofs of claims were filed. The trustee testified, however, that the company's records showed that the debts were owed.

The inventory sold at the bankruptcy auction in June, 1981, for about $29,000. James Foster testified that inventory generally sells at a low price at bankruptcy auctions. The trustee testified that the auction was well advertised and there were about 200 bidders present.

John Fassnacht testified that old inventory can be bought at a bargain price because it cost less when originally bought than the same inventory would cost new. He thought the inventory could have been sold to other dealers at the time of bankruptcy for about cost. Rick Fassnacht testified that at the time of bankruptcy the company had a lot of inventory that was good inventory but had not sold because the market was so poor at the time. He thought it could have been liquidated at cost or better. He testified that other companies had liquidated inventory at cost by selling to other dealers who still got a bargain by buying old inventory.

In the summer of 1980, Fassnacht attempted to borrow $50,000 to $75,000 for operating capital. Manufacturers Hanover Trust offered to lend $500,000 at a minimum but that was more than Fassnacht wanted or could afford. Fassnacht wanted only about $200,000 to pay off a debt of $150,000 to American National Bank and have $50,000 left over. According to John Fassnacht, officers of American National

Bank told him that it didn't have the money to lend. Charles Strain testified that the banks wouldn't lend the money without good real estate collateral that Fassnacht did not have.

The sale to Fontaine as a going concern fell through because of Fontaine's financial condition or the financial condition of its parent company.

John Fassnacht and Rick Fassnacht testified that in 1980 the company suffered from a severe reduction in income because a recession in truck sales or trucking in general caused a reduction in equipment sales. About 40% to 45% of the company's sales were to truck dealers and when their truck sales dried up, they quit buying. Some dealers, Ken Gardner Ford for example, closed. Both John and Rick Fassnacht gave the example of sales to Ed Wright Chevrolet. John Fassnacht said they dropped from $90,000 per month to $7,000 per month. Rick Fassnacht said they dropped from $80,000 to $8,000 per month. John Fassnacht testified that the cash flow problem caused the chapter 11 filing and the company was not insolvent.

The 1979 annual financial statement shows that Fassnacht suffered an operating loss for the year in the amount of about $34,000. The August, 1980 balance sheet showed a year to date profit of negative $334,401.02.

The trustee testified that he tried to sell the business as a going concern but was unsuccessful.

John and Rick Fassnacht and Chip Misgen testified that there was little change in the business's financial condition from August, 1980 to the time of filing of the bankruptcy petition.

The schedules filed in the bankruptcy case show total assets of about $319,000. That includes the leasehold improvements at $25,000 and inventory at $173,500. There is no separate listing for office supplies and equipment, which may be included in the inventory figure. At another place in the schedules, inventory is listed as $126,500.

## Insolvency under the Bankruptcy Test of Insolvency

Under 11 U.S.C. § 101(26), "insolvency" means:

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title. . . .

The definition raises three basic questions. What property is included in the calculation? What is meant by a fair valuation of the property? What debts are included in the calculation?

The court concludes that certain assets had no value available for the payment of creditors. The leasehold improvements could not be removed and sold by Fassnacht and there was no evidence that the lessor was obligated to pay Fassnacht anything for the improvements. They would have had value in a sale of the business as a going concern but probably not as much as the book value. In any event, the court thinks neither the business as a whole nor its property, including the leasehold improvements, had a going concern value. The business had an operating loss in 1979, a huge operating loss the first eight months of 1980, and was insolvent. For the same reason the court concludes that the business had no goodwill to be counted as an asset available for payment to creditors.

The only proof regarding the prepaid insurance was that it did not exist.

Reading also argued that $20,000 in preferences voluntarily returned to the trustee should be counted as an asset. The law is well settled that prior preferential payments are not counted in the debtor's assets since money already paid out in a transfer not avoidable by other creditors is

unavailable for paying them. 2 Collier on Bankruptcy ¶ 101.26 at 101–47 (15th ed. 1984).

As to debts owed, the court sees only one serious dispute. It concerns the $20,000 tax debt. The court has already concluded that it was owed.

■ The most difficult question is the meaning of fair valuation. Collier on Bankruptcy contains a long explanation that will not be repeated here. 2 Collier on Bankruptcy § 101.26[4] (15th ed. 1984). The gist of the explanation is that fair value does not mean the amount the property would bring in the worst circumstances or in the best, but the amount it would bring if the debtor took a reasonable time to collect its debts and sell its property. For example, a forced sale price is not fair value though it may be used as evidence on the question of fair value. Likewise, the fair value of salable assets is not what they would sell for in the slow process of the debtor's trade as if the debtor were continuing in business unhampered. The general idea of fair value is the amount of money that the debtor could raise from its property in a short period of time, but not so short as to approximate a forced sale, if the debtor operated as a reasonably prudent and diligent businessman with his interests in mind, especially a proper concern for the payment of his debts.

In this case the evidence of fair value did not include the expert opinion of any disinterested witness. Reading introduced evidence to show that the book value of the assets (generally cost or depreciated cost) was an accurate estimate of fair value. The trustee attacked these values as being too high.

■ The court is inclined to agree with the trustee's valuations as set forth in the August, 1980 balance sheet. Even accepting Chip Misgen's increase in inventory to $120,000, the company would still have been insolvent based on the $92,000 deficit figured earlier. To the extent the increase is based on supposed undervaluations, the court hesitates to accept it. Fassnacht ap-pears to have routinely overvalued its inventory, especially in the business circumstances of 1980. When business is so bad that good inventory will not sell, the inventory's market value may be much less than its cost. It does not have any intrinsic value based on cost. The additions based on missed assets are essentially included in Misgen's valuation of inventory at $120,-000. The court, however, could add $56,-000 to the balance sheet figure for the AFS and consignment inventory and the $16,000 in goods brought at auction. This would leave a deficit of $36,000. The court simply does not believe the assets were undervalued to that extent.

Since there was no substantial change in Fassnacht's financial condition from August, 1980 through the filing of the bankruptcy petition on November 12, 1980, the court concludes that it was insolvent during the entire 90 days before bankruptcy.

*The Other Elements of a Preference*

The court has concluded that Fassnacht was insolvent during the 90 days before bankruptcy, and the parties have limited this dispute to payments by Fassnacht to Reading in the 90 days before Fassnacht's bankruptcy. Thus, two of the elements are settled.

There is also no doubt that the payments were transfers of Fassnacht's property to or for the benefit of a creditor. That leaves only the questions of (1) whether the payments were on account of antecedent debts owed by Fassnacht before the payments were made and (2) whether the payments actually preferred Reading over other such creditors.

Under § 547(b)(5) a creditor is preferred if the transfer—

> (5) ... enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The trustee and Reading agreed that Reading was paid $31,606.36 in the 90 days before bankruptcy. Reading also filed a claim in the bankruptcy case for $7,287.98.

The trustee testified that he had on hand about $30,000. As to physical assets, he had on hand eight to ten filing cabinets worth about $75 each. He was also pursuing another preference suit against Suzanne Fassnacht for $100,000. The unsecured claims against the bankruptcy estate totaled about $243,000, which included $18,000 in priority claims.

Reading argued that the $100,000 that might be recovered from Suzanne Fassnacht should be counted in determining the amount creditors will be paid in the bankruptcy case. Even if the trustee does recover, the payment on general unsecured claims will still be a much lower percentage than the amount Reading received on the debts it was owed in the 90 days before Fassnacht's bankruptcy.

Exhibits 5 and 6 show the invoice dates, the dates checks were written to pay the invoices, the date the checks were received by Reading and the dates they were paid by Fassnacht's bank. The trustee apparently means to adopt the invoice dates as the date the debts were incurred. The invoice date, however, may not be the correct date for when a debt is incurred. *In re Valles Mechanical Industries, Inc.*, 21 B.R. 542, 9 B.C.D. 334, 6 C.B.C.2d 859 (Bankr.N.D.Ga.1982). In that case, the invoice date was later than the dates on which the debts were incurred.

█ Exhibit 10 (collective) in this case supports a conclusion that the invoice date was the latest date on which Fassnacht could be said to have incurred a debt to Reading for the invoiced goods. Readings' invoice is dated July 25, 1981 and shows the order date as July 10, 1981. The invoice is the sale contract with numerous terms and conditions on the back. The invoice is also the bill for the goods. Final-

ly, the invoice is dated the same date as the bill of lading for shipping the invoiced goods, which were shipped F.O.B. Readings' dock. The court concludes that Fassnacht incurred a debt for invoiced goods at the latest on the date of the invoice.

The result is that all the payments in question were payments on antecedent debts as shown by Exhibits 5 and 6. All the payments meet the requirements for being preferences recoverable by the trustee. However, there are certain exceptions to avoidance that may protect some of the payments.

### Exceptions to Avoidance

The trustee concedes that Reading is entitled to a credit of $7,469.38 under the exception set out in § 547(c)(4) for new value furnished to the debtor after the transfer in question. Exhibit 5 shows the new value furnished after each payment in question and appears to be correct under *In re Fulghum Constr. Corp.*, 706 F.2d 171, 10 B.C.D. 702, 8 C.B.C.2d 644 (6th Cir.1983).

Reading contends that one payment of $10,000 is within the exception for payments in the ordinary course of business. Section 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer—

. . . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms;

. . . .

The $10,000 payment was made by check written on September 4, 1980, received by Reading on September 9, 1980 and paid by

Fassnacht's bank on September 14, 1980. The invoice was dated July 25, 1980. The invoice and check are included in collective exhibit 10 that the court relied upon earlier.

The 45 days after July 25, 1980 expired at the end of September 8, 1980. The payment was within the 45 days only if the date of the check is taken as the date of payment.

The court has previously held that for purposes of the contemporaneous exchange exception in § 547(c)(1) payment by check is made when the check is received by the creditor. *In re Johnson,* 25 B.R. 889 (Bankr.E.D.Tenn.1982). Other courts have reached the same conclusion for payment by check under the exception for payments in the ordinary course of business.

The question in such cases has been whether to use the date the check was received or the date the check was paid by the debtor's bank. *O'Neill v. Nestle' Libbys P.R.,* 729 F.2d 35, 11 B.C.D. 1027, 10 C.B.C.2d 340 (1st Cir.1984); *In re Georgia Steel, Inc.,* 38 B.R. 829, 11 B.C.D. 1163 (Bankr.M.D.Ga.1984); *In re Hoover,* 32 B.R. 842, 10 B.C.D. 1347 (Bankr.W.D.Okla. 1983); *In re Advance Glove Manufacturing Co.,* 25 B.R. 521, 9 B.C.D. 1395 (Bankr. E.D.Mich.1982); *In re Thomas W. Garland, Inc.,* 19 B.R. 920, 8 B.C.D. 1357 (Bankr.E.D.Mo.1982). All but one of the cited cases picked the date the check was received as the date of payment. The other case (Advance) picked the date the check was paid by the debtor's bank. None of the cases used a date earlier than the date the check was received.

█ In this case, the check was received after the end of the 45 day period. The result is that the exception for payments in the ordinary course of business does not apply.

None of the other payments are as close to being within the 45 day period. Apparently the general exception for contemporaneous exchanges cannot apply. See *In re Arnett,* 731 F.2d 358, 11 B.C.D. 1097, 10 C.B.C.2d 533 (6th Cir.1984).

*Conclusion*

Except for the $7,469.38, within the new value exception, the trustee is entitled to recover the payments to Reading within 90 days before Fassnacht's bankruptcy. The court will enter judgment for the trustee in the amount of $31,606.36 less $7,469.38, which equals $24,136.98.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.