In re DAK INDUSTRIES, INCORPORATED, a California corporation, Debtor.

Edward M. WOLKOWITZ, Chapter 7 trustee of DAK Industries Incorporated, a California corporation, Plaintiff,

v.

AMERICAN RESEARCH CORPORATION, Dot–Line Transportation, Hyosung, Japan Freight Consolidators, and Home Theatre Products, Defendants.

Bankruptcy No. LA 92–33128–SB.
Adv. Nos. 94–03057–SB, 94–03094–SB, 94–03099–SB, 94–03072–SB, 94–03084–SB and 94–03078–SB.

United States Bankruptcy Court, C.D. California.

Jan. 18, 1996.

Edward M. Wolkowitz, Chapter 7 Trustee, Robinson Diamant Brill & Klausner, Los Angeles, CA.

Michael C. Lieb, Richard W. Esterkin, Los Angeles, CA, for Hyosung.

James B. Yobski, Stuart I. Koenig, Los Angeles, CA, for Trustee.

J.D. Fullman, Costa Mesa, CA, for Dot–Line Transportation.

Christopher McNatt, Los Angeles, CA, for Japan Freight Consolidators.

Lawrence Reinhold, El Monte, CA, for American Research Corporation.

Glenn P. Hanneman, Irvine, CA, for Home Theatre Products.

## MEMORANDUM DECISION

JAMES M. MARLAR, Bankruptcy Judge.

The Trustee commenced a preference action against the following defendants: American Research Corporation, Dot–Line Transportation, Hyosung, Japan Freight Consolidators, and Home Theatre Products. A trial on selected bifurcated issues was held during the week of September 11–14, 1995. Appearances were made by the following attorneys: Stuart I. Koenig and James B. Yobski for the Trustee; Richard W. Esterkin and Michael Lieb for Hyosung; Christopher McNatt for Japan Freight Consolidators; Lawrence Reinhold for American Research Corporation; Glenn P. Hanneman for Home Theatre Products; Jay D. Fullman for Dot–Line Transportation. Richard Oto appeared on behalf of Discopylabs to announce that that entity had settled its dispute with the Trustee. Mr. Oto was thereafter excused. Various witnesses testified, exhibits were admitted, and arguments received. The court has now considered the facts and the law, and issues its ruling.

## I. STIPULATED FINDINGS OF FACTS.

The following facts were stipulated by the parties, and are therefore adopted by the court as its findings:

### A. Pre–Petition

1. Prior to June 11, 1992, DAK Industries Incorporated ("DAK") was engaged in business as a direct marketer of consumer electronics and computer products, primarily through mail order catalogs.

2. Prior to June 11, 1992, DAK ordered and received substantial quantities of goods, products or services from American Research Corporation, Dot–Line Transportation, Hyosung, Japan Freight Consolidators, and Home Theatre Products (collectively referred to hereafter as the "defendants").

3. The Trustee is not seeking to recover any payments made by DAK to any of the defendants past the ninety (90) days prior to June 11, 1992.

4. Each of the defendants was a creditor of DAK ninety (90) days prior to June 11, 1992, and at all times subsequent thereto.

5. The debts owed by DAK to each of the defendants were incurred by DAK in the ordinary course of the business or financial affairs of DAK and each of the defendants.

6. Each of the defendants received transfers of DAK's property or obtained a lien on DAK's property on or within ninety (90) days prior to June 11, 1992, in payment of the debts owed by DAK to each of the defendants (the "transfers"). One of the defendants, American Research Corporation ("ARC"), disputes the foregoing as to itself and will litigate this issue in later proceedings with respect to ARC's other defenses to the Trustee's Counterclaim against ARC. The remaining defendants do not dispute the foregoing contention by the Trustee.

7. The transfers were to or for the benefit of each of the defendants as creditors of DAK.

8. DAK is a California corporation which filed its voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on June 11, 1992 (the "petition date"). The ninetieth day prior to the petition date was March 13, 1992 (the "ninetieth day").

### B. *Post–Petition.*

1. DAK operated as a debtor-in-possession until December 12, 1994, when this court converted DAK's bankruptcy case to a case under chapter 7 of title 11 of the United States Code.

2. On December 15, 1994, Edward M. Wolkowitz was appointed chapter 7 trustee for DAK (the "trustee") by the United States Trustee.

### II. *CONTESTED MATTERS.*

The parties have likewise stipulated that the following factual or legal issues exist for determination of this matter:

### A. *Issues of Fact.*

1. Whether the value of DAK's assets exceeded its liabilities during the period from March 13, 1992 to June 11, 1992.

2. Whether DAK's assets exceeded DAK's liabilities on or before March 13, 1992.

3. What was the value of DAK's assets on or after the ninetieth day, but prior to the petition date.

4. What was the amount of DAK's liabilities on or after the ninetieth day, but prior to the petition date.

5. Whether DAK was a going concern on or after the ninetieth day, but prior to the petition date.

### B. *Issues of Law.*

1. Whether a liquidation value of DAK's assets on or about the ninetieth day is the proper standard for valuing DAK's assets to determine whether DAK was insolvent pursuant to 11 *U.S.C.* § 547(b)(3).

2. Whether a going-concern valuation of DAK's assets on or about the ninetieth day is the proper standard for valuing DAK's assets to determine whether DAK was insolvent pursuant to 11 *U.S.C.* § 547(b)(3).

3. What is the proper standard for calculating DAK's liabilities to ascertain whether DAK was insolvent pursuant to 11 *U.S.C.* § 547(b)(3).

4. Whether the trustee has carried his burden of proving that DAK was insolvent pursuant to 11 *U.S.C.* § 547(b)(3) after the ninetieth day, but prior to the petition date.

5. Whether the transfers enabled each of the defendants to receive more than they would have received if the case were a case under chapter 7 of title 11, the transfers had not been made, and each of the defendants received payment of such debt to the extent provided by the provisions of chapter 7.

## III. *PROCEDURAL HISTORY.*

### A. *Bifurcation of Issues.*

Earlier, the court ordered that the § 547(b) solvency and hypothetical distribution under chapter 7 issues be severed from the more individualized § 547(c) defenses. Therefore, the determination of the issues present in this hearing shall determine whether it is necessary to proceed to further hearings.

### B. *Motion For Involuntary Dismissal.*

At the conclusion of the trustee's case, the defendants moved for dismissal, claiming that the plaintiff failed to prove a *prima facie* case of insolvency. That motion is denied.

## IV. *SUMMARY OF WITNESSES AND EXHIBITS.*

In the order presented at trial, the witnesses gave the following testimony.

### A. *Ronald E. Whitman.*

1. Mr. Whitman was DAK's corporate comptroller for six years, beginning in 1987.

2. During that period, DAK's annual sales grew from $80 million to $200 million.

3. As comptroller, Mr. Whitman had the responsibility for the company's prepared income statements, profit and loss statements, balance sheets and general ledgers. He also assisted in the preparation of financial reports for DAK's primary lender, The Tokai Bank, Ltd.

4. At its height, DAK employed approximately 450 people. DAK's business was the mail order selling of computer hardware, software, a combination of both, and various other electronic items.

5. The principal person behind DAK's success was Drew A. Kaplan, its CEO and 100% shareholder. Mr. Kaplan was, in essence, a one-man "marketing department," testing products, writing copy and personalizing the DAK "message" to those on DAK's sizable mailing lists.

6. DAK, through licensing agreements, was able to advertise and sell the software products of others, including Borland and Microsoft. These licensing agreements had to be purchased by DAK, however, for substantial sums. Some arrangements required cash deposits as high as $1,000,000.

7. DAK's assets, among other things, consisted of hardware, software inventory on hand, electronic items, "deposits" for software products, and product "labels." DAK also had some equipment. It owned no real property.

8. At one point, in approximately 1990–1991, DAK entertained the idea of an initial public offering (IPO) for its stock. This idea eventually collapsed, however, and DAK remained privately-held. This "going public" concept was conceived as a tool by which the company could increase its capital structure.

9. According to Mr. Whitman, in May of 1991 the company's financial condition was extremely dire. DAK was very close to losing its ability to meet its debts as they became due. At that time, in an effort to generate cash, DAK's largest mailer went out. Its purpose was threefold: (1) to reduce excess inventory and generate cash; (2) to defer income taxes; and (3) to increase sales so that the contemplated public offering would receive a boost.

10. Unfortunately, sales were lower than projected, and the third quarter was showing a loss. According to Mr. Whitman, Tokai Bank was "close to panic," and trade creditors were being paid "very late."

11. DAK began searching for capital, through either equity or debt financing. These efforts proved unsuccessful. Profits were non-existent, sales were low, neither software nor "used product" were re-selling in the necessary quantities, returns were increasing, and no new cash infusion sources were available.

12. At the same time, Drew Kaplan was distracted from producing his hand-written catalogues by the quest for capital, DAK's lender problems, and the constant drain on his time produced by the IPO meetings.

13. In the fall of 1991, DAK resorted to a "DAK Needs Money" catalogue promotion. Although the sales from that promotion were good, they were not enough to stop the slide toward bankruptcy.

14. In 1992, according to Mr. Whitman, the company lost over $20 million. In the first quarter of its 1992 fiscal year, DAK lost $5 million.

15. Discussions concerning bankruptcy were held in March and April, 1992. Eventually, DAK "ran out of money" and was unable to operate without bankruptcy protection.

16. At the date of bankruptcy, again according to Mr. Whitman, DAK was meeting its liabilities on a "somewhat current basis."

17. The schedules of assets and liabilities were prepared from DAK's books and records, and reflected the assets at cost figures, not market value, and the liabilities were taken from the accounts payable records of the company.

18. Mr. Whitman offered his opinion that between March 11, 1992 and June 11, 1992, DAK was "completely insolvent," which he understood to mean that DAK was unable to generate sufficient cash with which to meet its liabilities.

19. The assets of the company, through the date of filing, were carried at cost, and were not adjusted to market value. Post-bankruptcy, the assets were written down by $10 million in order to generate a $4 million tax refund from the federal government. Once the $10 million figure was arrived at, there was no need to continue with further write-downs, because to do so would not have produced additional refunds.

### B. *Gary Mintz.*

1. Gary Mintz is a professional liquidator. Although experienced in this profession since 1973, he holds no appraisal licenses. His experience, both with his own company, Great American Group, and with others, has been that he has assisted in the liquidation of several small and large entities, including, among others, Arlan's Department Stores, W.T. Grant's, Earth Shoe Co., Robert Hall Clothiers, and Federated Department Stores.

2. The company's liquidation methodology involves the reviewing and pricing of merchandise for resale, and implementing the sales associated with the liquidations.

3. Occasionally, the company will bulk purchase items, and then re-sell them at a profit.

4. Mr. Mintz' company maintains employees who have specialized expertise. In the case of DAK, he utilized three individuals with experience in valuing computer hardware and software, and the related electronics items.

5. In June, 1991, one year before the bankruptcy, Mr. Mintz' company was called by DAK to review its liquidation options. At that time, he reviewed information on the extent of DAK's assets, walked the warehouse and observed the quantities and types of inventory, and made an effort to "cost out" the goods. In so doing, Mr. Mintz determined that there were three possible ways of achieving the highest returns:

    a. Sell "off-price" retail, and realize between 39–43% of the retail cost.

    b. Sell "off-price" wholesale, and recover about 52% of cost;

    c. Sell using a combination of the first and second alternatives. This effort would realize values somewhere between 39–52%.

6. After June, 1991, the discussions progressed no further. However, two years later, on or about October 25, 1993 Paul Abramowitz, who was then working for DAK as the Special Assistant to the President, contacted Mr. Mintz. That conversation did not result in an engagement.

7. In December, 1994, Mr. Mintz was contacted by the bankruptcy trustee, and Great American was asked to bid on the inventory. Again, nothing productive came of this contact.

8. In the summer of 1995, Mr. Mintz was again contacted by the trustee, who asked him to value the debtor's inventory for the periods affected by this preference action, the 90–days preceding the filling.

9. Mr. Mintz, provided with lists of inventory on hand during the critical preference period times, attempted to reconstruct values for the goods on hand. From those figures, Mr. Mintz deducted the estimated costs of

sale, and arrived at a liquidation value opinion for the goods on hand.

10. Mr. Mintz valued the goods at $9.5 million, from which he deducted $1.2 million in selling costs, for a net asset figure of $8.3 million during the critical 90–day period.

### C. *Andrew Miller.*

1. Mr. Miller is a senior vice-president of Houlihan, Lokey, Howard & Zukin ("HLH & Z") in its "restructuring group." His experience has involved the representation of interested parties, such as bondholders, in troubled business restructuring.

2. Mr. Miller testified on behalf of the debtor, in its early struggles to gain use of a secured creditor's claimed cash collateral, and in assisting DAK in the preparation of its cash flow forecasts. HLH & Z was retained by the official unsecured creditors' committee, as an advisor.

3. With regard to the cash collateral hearings, HLH & Z did not attempt to value any of DAK's assets. He did believe that the cash flow numbers presented to the court at that time were "incredibly conservative." (*See* Ex. 3).

4. Moreover, HLH & Z did not attempt to sell the DAK business; it only inquired of proposed venture capitalists whether there might be an interest in future financing on some basis. Part of the problem in this regard, however, was that Drew Kaplan, the president of DAK, resisted the ownership of others. According to Mr. Miller, Kaplan preferred to maintain "absolute control."

5. About a month or so after the cash collateral hearings (July 28, August 17, and August 24, 1992), when DAK began to fall short on its cash flow projections, Mr. Miller began to doubt DAK's chances for survival.

6. HLH & Z prepared a memorandum to the official creditors' committee, dated September 28, 1992 (Ex. 5), which commented upon DAK's efforts to reach accommodation with Tokai Bank concerning the continued use of the bank's cash collateral. In the letter, HLH & Z opined that:

a) DAK had failed to meet its aggressive sales forecasts for August and September, 1992;

b) DAK's failure was due to Drew Kaplan's inability to concentrate on marketing issues, being distracted by the bankruptcy process;

c) DAK was very likely to fail with regard to its future forecasts as well, due to a perceived lack of ability to get its catalogues completed, published and mailed on a timely basis;

d) DAK had a discounted going concern value (excluding Drew Kaplan) of between $22 and $30 million;

e) After valuing the business as a discounted going concern, and then liquidating it (if necessary), and after paying Tokai Bank the $18,000,000 owed to it as a secured creditor, unsecured creditors would realize between 17–53% of their debts.

7. A few days later, on October 9, 1992 (Ex. 6), HLH & Z authored another memorandum to the committee. In it, HLH & Z attempted to once again value DAK as a going concern. This time, however, HLH & Z described an error in its September 28, 1992 assumptions, *i.e.*, that vendor trade credit would be re-established. Since it was acknowledged that only a fraction of that foreign trade credit would be re-established, the new value ascribed to the company adjusted downward, leaving it in the range of $14.5 to $22.5 million. HLH & Z's revised opinion was that unsecured creditors would realize a low of zero and a high of only 19.6% on their claims.

### D. *Paul Abramowitz.*

1. Mr. Abramowitz is a certified public accountant who holds an MBA degree from USC. He has been involved with various businesses in the course of his professional experience.

2. On June 12, 1992, the day after DAK filed chapter 11, Mr. Abramowitz was contacted by Drew Kaplan, and asked to assist DAK in working through its reorganization effort. Mr. Abramowitz became associated with DAK as the "Special Assistant to the President." His duties involved, among other things, bank communications, finance,

bankruptcy liaison and purchasing. Mr. Abramowitz reported directly to Kaplan, and he initiated a review of all departmental operations.

3. Mr. Abramowitz immediately determined that the DAK inventory was "out of control," but that the company might receive a $4 million tax refund if it was able to physically scrap and "write-down" $10 million in inventory. This was accomplished in the last two weeks of June, 1992. Beyond the $10 million write-down, DAK was unable to realize further economic benefit. Thereafter, the remaining inventory continued to be carried at book value. Mr. Abramowitz also felt that license deposits from major software vendors needed to be adjusted.

4. DAK's third cash flow forecast (Ex. 3) was created at Mr. Abramowitz' suggestion. As matters turned out, the forecast was inaccurate, because DAK was unable to meet its mailing schedule, and therefore, anticipated cash flows were irretrievably lost.

5. In December, 1994, Abramowitz supervised the preparation of a DAK balance sheet, which attempted to revalue DAK's assets at "fair market value," rather than "cost" or "book." (Ex. 9). This value was determined by estimating what the assets would bring if they were disposed of over a reasonable period of time. It was not prepared as a "going concern" valuation, but was, in essence, a liquidation value. The conclusion of that report was that DAK's asset value, on June 10, 1992, was actually $23,520,000, rather than the $57,166,000 carried on the books.

6. The drastic difference was due to several factors, primarily affecting inventory. First, from a starting figure of $34,485,000, the physical scrapping of $10,925,000 worth of inventory reduced the book value to $23,560,000. Then, inventory book (or cost) value was written down. The sum of $13,443,000 further reduced the value, in order to reflect additional write-downs for charge-back reserves, worthless intra-company receivables, unusable inventory deposits of $7,743,382, prepaid advertising adjustments, the liquidation value of machinery and other equipment, and subsequent license terminations ($3,306,861). In essence, Exhibit "9"

was created by DAK with the "perfect hindsight" of two and one-half years after the filing.

### E. *Drew Allen Kaplan.*

1. Drew Allen Kaplan was the President and founder of DAK. He began his entrepreneurship in 1964, while he was a freshman at UCLA, selling tapes and cassettes to other students.

2. Eventually, after a series of innovative marketing businesses, he developed a mail-order business, and entered the computer sales business. His marketing methods to "DAKonians," as his customers were called, relied heavily on his personal touch, with individual review and comment on each major product offered by DAK.

3. Finding capital for DAK's burgeoning inventory demands and successful promotions required debt-financing. Tokai Bank lent money to DAK, enabling the company the ability to deal directly with suppliers, thereby eliminating the cost of the middleman. DAK successfully sold both new and used inventory. It did not get involved with mass-marketed items, but bought and sold either "ahead or behind the game," marketing items others believed to be obsolete, or on the fringe.

4. In mid–1991 and fiscal year 1992, the company's profits ebbed, and DAK suffered losses from which it was unable to recover.

5. At one time, about a year before the bankruptcy, Mr. Kaplan believed his stock to be worth approximately $30,000,000.

### F. *Kenneth A. Bodenstein.*

1. Mr. Bodenstein is a chartered financial analyst (CFA), and is currently a senior Vice-president at Duff. & Phelps, Inc., with experience in business valuations. He was employed by the defendants in this case to value DAK during the 90 days leading up to the filing of the chapter 11. In preparing for this engagement, Mr. Bodenstein reviewed DAK's internal documents, as well as court documents and transcripts in this case.

2. Mr. Bodenstein analyzed DAK as a going concern. As of the date of bankruptcy

(or within a few days thereof, May 31, 1992), Bodenstein felt the value of the business was $20 to $25 million, from which one would then subtract the Tokai secured debt. After that adjustment, he felt the company's equity would be worth $2,049,000—$7,049,000 (Ex. B). In arriving at this conclusion, Mr. Bodenstein compared the DAK statistics to those of publicly-traded companies whose information was available. These other companies, his "comparables," were then adjusted to suit his subject, DAK.

3. The value which Mr. Bodenstein ascribed to DAK, as a going concern, would include (at least for a short or intermediate term), the services of Drew Kaplan. This, he stated, would be a normal requirement in any sale of the business.

4. Mr. Bodenstein agreed that, when DAK was doing well, Mr. Kaplan's stock might well have been worth as much as $30 million.

5. Eventually, as DAK was unable to pull out of bankruptcy, Kaplan's stock became worthless.

6. Mr. Bodenstein, while deducting secured debt from his valuation, did not, in the same methodology, deduct unsecured debt. His rationale was that such obligations are short-term and are immediately reduced by ongoing cash flows. Thus, in his opinion, the amount of the unsecured obligations are of no consequence in the valuation of a company as a going concern.

### G. *Other Documentary Evidence.*

The parties introduced other exhibits, consisting of earlier financial records of DAK (Ex. C–1990 and 1991); various pleadings from cash collateral hearings (Ex. F, I, J, P); audit standards (Ex. L); and other items (e.g., Mintz Notes, Ex. M).

### V. *LEGAL DISCUSSION.*

In order to prevail in preference actions, a trustee must prove each element of § 547(b). If he fails to prove a single element, the preference action must be dismissed. *In re Bownic Insulation Contractors, Inc.,* 134 B.R. 261 (Bkrtcy.S.D.Ohio 199); *see also In re California Trade Technical Schools, Inc.,* 923 F.2d 641 (9th Cir.1991).

The dispositive issue, then, is whether, for preference purposes under § 547, the court should apply a "going-concern" or a "liquidation" valuation to the assets of the debtor-in-possession. Pursuant to § 547(b), the trustee may recover a transfer made:

  (1) to of for the benefit of a creditor;

  (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

  (3) made while the debtor was insolvent;

  (4) made—

    (A) on or within 90 days before the date of the filing of the petition;

    \*    \*    \*    \*    \*    \*

  (5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 *U.S.C.* § 547(b). In this case, the only questions are (1) whether DAK was insolvent, (2) which "test" applies at the time of the challenged transactions; and (3) how insolvency should be defined. The balance of the issues under § 547 have already been resolved or stipulated.

Pursuant to 11 U.S.C. § 101(32) a corporate debtor is "insolvent" if it has a:

  ... financial condition such that the sum of such entity's debts is greater than all of such entity's property, *at a fair valuation,* exclusive of [certain property enumerated in the statute] (emphasis added).

The overwhelming consensus in the case law is that the valuation should be made from the vantage of a going concern. *Matter of Taxman Clothing Co., Inc.,* 905 F.2d 166 (7th Cir.1990); *In re A. Fassnacht & Sons, Inc.,* 45 B.R. 209, 217 (Bankr.E.D.Tenn.1984); *In re Mama D'Angelo, Inc.,* 55 F.3d 552, 556 (10th Cir.1995); *In re Art Shirt Ltd., Inc.,* 93 B.R. 333, 341 (E.D.Pa.1988); *In re Vadnais*

Lumber Supply, Inc., 100 B.R. 127, 131 (Bankr.D.Mass.1989); *Pittman v. Union Planters Nat'l Bank & Trust Co. (In re Nat'l Cottonseed Products Corp.)*, 118 F.2d 211, 214–15 (6th Cir.1941); *J.W. Butler Paper Co. v. Goembel*, 143 F. 295 (7th Cir.1905); *In re Gibson Hotels, Inc.*, 24 F.Supp. 859, 863 (S.D.W.Va.1938); *Chicago Title & Trust Co. v. John A. Roebling's Sons*, 107 F. 71 (D.Ill. 1901); *In re Miller & Rhoads, Inc.*, 146 B.R. 950, 955 (Bkrtcy.E.D.Va.1992); *see also* 2 Collier's on Bankruptcy, 15th ed., ¶ 101.32, p. 101–123. The going-concern value is not the proper standard, however, if the business was "on its deathbed" or if its liquidation was clearly imminent when the transfers were made. *Id.* This sometimes becomes a difficult factual issue because the determination of whether the business was on its "deathbed" is frequently made *after* the business has succumbed to its financial ills. However, "caution should be taken not to consider property as 'dead' merely because hindsight teaches that the debtor was traveling on the road to financial ruin." *In re Taxman Clothing, supra* at 170 *quoting* 2 Collier on Bankruptcy.

Notably, although there has been significant argument presented and many different variations on a theme, there appears to be no dispute between the parties as to the legal standard to be applied here. The case authority cited above was taken from the briefs of both the trustee and Hyosung. More importantly, the authority is all consistent. The only dispute for this court to resolve is a factual matter: whether DAK had reached the point of peril such that liquidation was clearly imminent on the date of the challenged transfers.

## VI. *FINDINGS OF FACT.*

█ The record is clear that this case was filed under chapter 11 of the Bankruptcy Code on June 11, 1992. DAK then operated as a debtor-in-possession for 30 months, until December 15, 1994, when it was converted to chapter 7 and required to be liquidated.

On review of the facts presented in the case authority, this court was immediately struck by the complete absence of any cases in which the debtor-in-possession operated for such a lengthy period of time. The trustee cites several cases where a liquidation valuation was used. However, the facts were much different than those present in this case. In *In re A. Fassnacht & Sons, Inc., supra*, the debtor operated for less than five months before converting to chapter 7. In *In re Mama D'Angelo, Inc., supra*, the case was converted within six months of filing. In *Moody v. Security Pacific Business Credit, Inc.*, 85 B.R. 319 (W.D.Pa.1988), the case originally filed under chapter 7, and therefore it is not applicable here. In *In re Utility Stationery Stores, Inc.*, 12 B.R. 170 (Bkrtcy.N.D.Ill.1981), the opinion was written only 13 months after the case was filed. In *In re Miller & Rhoads, Inc., supra*, the debtor operated for only four months before it converted.

The only case with facts even remotely similar to the case at bar is *In re Vadnais Lumber Supply, Inc., supra*, in which the court applied a going concern valuation. At the time that opinion was written, the debtor-in-possession had been operating for 21 months. In contrast, DAK operated for 30 months after seeking bankruptcy protection. Two and one-half years is a significant period of time. Although a struggling debtor, with a few last gasps, could limp along for a few months after filing bankruptcy, it is difficult to conceive that a terminally ill business could forestall its inevitable demise for two and one-half years. This ongoing effort, taken together with the fact that DAK's statements and schedules reflected a solvent debtor, leads this court to the inescapable factual conclusion that DAK was a going concern at the time of the transactions questioned here by the trustee, and as a going concern, had sufficient value—if operated efficiently and with a reasonable reorganization plan—to have theoretically paid its creditors in full.

Having decided the law, the relevant factual inquiry is the quantification of DAK's "going concern" value. The parties presented a variety of information on value, both as a going concern and if liquidated.

Attached is a detailed chart, compiling the evidence produced by the parties with regard to valuation. The evidence is mixed. See attached Exhibit A.

After consideration of all of the evidence, the court finds that Mr. Bodenstein's analysis is an appropriate valuation of the value of the debtor's business. Mr. Bodenstein's explanations of his methods were adequately detailed. Application of this analysis to the facts of this case reveals that DAK, on the date of the challenged transaction, had a "going concern" value, defined as a value greater than what was required to pay its creditors given difficult but generally normalized operating conditions, of between $1.3 to $7.0 million in equity. Therefore, the trustee failed to not satisfy burden of the equitable insolvency test of DAK's being unable to pay its debts as they become due. Therefore, the court finds that DAK was solvent on the date of filing.

## VII. CONCLUSIONS OF LAW.

The legal issues are resolved as follows:

A. Is the liquidation value of DAK's assets on or about the ninetieth day the proper standard for valuing DAK's assets for purposes of determining whether DAK was insolvent pursuant to 11 *U.S.C.* § 547(b)(3)? The court concludes that liquidation is not the appropriate legal standard.

B. Is the going-concern valuation of DAK's assets on or about the ninetieth day the proper standard for valuing DAK's assets for purposes of determining whether DAK was insolvent pursuant to 11 *U.S.C.* § 547(b)(3)? The court concludes that the

going concern value is the appropriate legal standard.

C. What is the proper standard for calculating DAK's liabilities to ascertain whether DAK was insolvent pursuant to 11 *U.S.C.* § 547(b)(3)? The court concludes that such standard is that of a going concern.

D. Has the trustee carried his burden of proving that DAK was insolvent pursuant to 11 *U.S.C.* § 547(b)(3) after the ninetieth day, but prior to the petition date? The trustee failed to carry his burden of proof on the issue of insolvency, for any period from 90 days prior, to the filing of the chapter 11.

E. Did the transfers enable each of the defendants to receive more than they would have received if the case were a case under chapter 7 of title 11, the transfers had not been made, and each of the defendants had received payment of such debt to the extent provided by the provisions of chapter 7? Since the court has found, as a matter of fact, that the debtor was solvent, the court concludes that it is unnecessary to decide this issue.

## VIII. RULING.

The prevailing parties in this phase of the litigation are the defendants. Because of this ruling, further hearings are not required. Counsel for the defendants shall lodge an appropriate judgment within 20 days.

EXHIBIT A

| Evidence (document, individual) | Source/credential | Method of Valuation |
| --- | --- | --- |
| Alco Capital Group, Inc. | Liquidation analysis | Liquidation |
| Great American Group (Mr. Mintz) | Liquidator | Liquidation |
| Schedules | Sworn Bankruptcy Schedules | Cost |
| Debtor's Third Forecast | Debtor's Projected cash flow | Adjusted cost (closely akin to market |
| Houlihan Lokey | Sept. 28, 1992 letter | Market Multiples Valuation (going concern) |
| Houlihan Lokey | October 9, 1992 | Market Multiples Valuation (going concern) |

| Evidence (document, individual) | Source/credential | Method of Valuation |
|---|---|---|
| DAK Balance Sheet | DAK internal bookkeeping document | Cost |
| DAK Inventory Sheet | DAK internal bookkeeping document | Cost |
| DAK Balance Sheet | DAK internal document | Fair market value. Adjusted as of June 10, 1992 by events accruing after June 10, 1992 |
| DAK inventory sheets | DAK internal document | Cost |
| Valuation work Sheets | Kenneth Bodenstein | Going concern |
| Valuation Work Sheets | Kenneth Bodenstein | Fair Market value |

| Evidence (document, individual) | Date of Val./Preparation | Asset Value date of Valuation |
|---|---|---|
| Alco Capital Group, Inc. | Apr. 28, 1991 | $45,142,000 |
| Great American Group (Mr. Mintz) | Aug. 4, 1995 (for 6/11/92) | NA |
| Schedules | June 11, 1992 | $53,886,389 |
| Debtor's Third Forecast | July 24, 1992 | $22,662,000 |
| Houlihan Lokey | Sept. 28, 1992 | $22,000,000–$30,000,000 |
| Houlihan Lokey | Sept, 28, 1992 | $14,500,000–22,500,000 |
| DAK Balance Sheet | July 27, 1991 | $68,362,343 |
| DAK Inventory Sheets | June 11, 1992 | $33,731,793 |
| DAK Balance Sheet | Dec. 1994 (as of 6/10/92) | $23,520,000 ($57,166,000 adjusted to FMV) |
| DAK Inventory sheets | Nov. 19, 1994 | $8,937,116 |
| Valuation Work Sheets | May 31, 1992 | $2,000,000–$7,000,000 (equity only) |
| Valuation Work Sheets | May 30, 1992 | $49,561,400 |

| Evidence (document, individual) | Asset Values March 11, 1992 | Asset Values March 12—June 10, 1992 |
|---|---|---|
| Alco Capital Group, Inc. | NA | NA |
| Great American Group (Mr. Mintz) | NA | NA |
| Schedules | NA | NA |

| Evidence (document, individual) | Asset Values March 11, 1992 | Asset Values March 12—June 10, 1992 |
|---|---|---|
| Debtor's Third Forecast | NA | NA |
| Houlihan Lokey | NA | NA |
| Houlihan Lokey | NA | NA |
| DAK Balance Sheet | NA | NA |
| DAK Inventory Sheets | NA | NA |
| DAK Balance Sheet | NA | $57,166 (May 30, 1992) |
| DAK Inventory sheets | NA | NA |
| Valuation Work Sheets | NA | $2,000,000– 7,000,000 (equity 5/31/92) |
| Valuation Work Sheets | NA | $49,561,000 (5/30/92) |

| Evidence (document, individual) | Asset Values June 11, 1992 | Exhibit No. |
|---|---|---|
| Alco Capital Group, Inc. | NA | 10 |
| Great American Group (Mr. Mintz) | $9,537,638 (1,267,500) selling costs 8,270,138 Net | 12 |
| Schedules | $53,886,389 | 2 |
| Debtor's Third Forecast | $22,662,000 | 3 |
| Houlihan Lokey | NA | 5 |
| Houlihan Lokey | NA | 6 |
| DAK Balance Sheet | NA | 1 |
| DAK Inventory Sheets | $33,731,793 | 7 |
| DAK Balance Sheet | $57,166,000 | 9 |
| DAK Inventory sheets | NA | 8 |
| Valuation Work Sheets | $2,000,000 - $7,000,000 (equity only) | B (page 4) |
| Valuation Work Sheets | $1,307,547–$1,919,904 (equity) $49,561,400 (assets) | B (page 10) |

| Evidence (document, individual) | Net Recovery in Dollars | Comment |
|---|---|---|
| Alco Capital Group, Inc. | $23,234,900–$28,644,900 | — |
| Great American Group (Mr. Mintz) | $8,270,138 | — |
| Schedules | NA . | Total debt $45,358,589 |
| Debtor's Third Forecast | Not provided | — |
| Houlihan Lokey | 17–53% of unsecured claims paid | Value discounted by 20% due to anticipated absence of Drew Kaplan |
| Houlihan Lokey | 0–19% of unsecured claims paid | Loss of foreign trade vendors on reestablished credit. |
| DAK Balance Sheet | — | Liabilities $54,720,059 |
| DAK Inventory Sheets | — | Inventory only. Excludes cash, equipment, etc. |
| DAK Balance Sheet | — | Liabilities $47,052,000 |
| DAK Inventory sheets | — | — |
| Valuation Work Sheets | Full | — |
| Valuation Work Sheets | Full | Liabilities $47,753,619 |